IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

**MARK GRANAS**,                                   Civ. No. 1:21-cv-00116-AA

        Plaintiff,                              **OPINION AND ORDER**

    v.

**UNION PACIFIC RAILROAD
COMPANY**,

        Defendant.

_____

AIKEN, District Judge:

Plaintiff is a former train conductor for defendant Union Pacific Railroad. Plaintiff claims that defendant violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112.  Before the Court is defendant's motion for summary judgment, ECF No.  30.  For the reasons explained

## BACKGROUND

### I.     Plaintiff's Job Responsibilities at Union Pacific

Defendant hired plaintiff in 2003, where at different times plaintiff worked as a trainman, a conductor, or a brakeman over the 17-year period.  Barney Decl., Ex. D at 17:3-18.  Breakmen and conductors must be able to (1) get on and off stationary

equipment; (2) ride on moving cars by holding onto grab irons and standing on ladder steps; and (3) align drawbars by using available equipment to lift, pull or push on the drawbar. Walsh Decl., Ex. B (Union Pacific Job Description Brief).

Plaintiff frequently worked a route between Klamath Falls, Oregon and Eugene, Oregon. Walsh Decl., Ex. A, at 29:2-11. This scenic route passes through mountainous terrain, and has sharp drop offs along certain parts of the track. *Id*. at 29:19-25. Along this route, plaintiff sometimes rode on moving train cars while holding unto the car's grab irons and ladder steps. *Id*. at 24:13-22. Plaintiff used a "three-point stance," where he would "use [his] left hand as [his] anchor arm to hang onto a ladder rung and, of course, both feet would be planted firmly" and plaintiffs "right hand was used for radio communication or hand signals." *Id*. at 25:16-20. Plaintiff would also "loop [his] arm underneath one of the railings and hang onto it," with his other arm placed above his head. *Id*. at 27:6-10. Most times along this route, plaintiff would sit in the cab next to the train engineer; however, in the event of a break in the train cars or another issue, plaintiff would ride outside on the train. *Id*. at 36:13-22.

While Union Pacific brakemen at times carry a tool called a "brake stick" that allows the worker to tie railcar brakes while standing at ground level, on occasion, plaintiff would climb onto railcars to reach the brakes directly. Barney Decl. Ex. D at 34:18-35:7. Plaintiff recalls climbing ladders up to eight to ten feet high, but testified that while riding railcars short distances, "[m]ost of the time [he] would be on the bottom rung." *Id*. at 42:6-9. On the occasions where plaintiff was assigned to

work aboard trains traveling between Klamath Falls and Eugene, plaintiff generally did not ride hanging on the outside of equipment. *Id*. at 36:2-22. Rather, he rode in the locomotive cab along with the engineer. *Id*. at 26:7-12. It was rare that plaintiff might be required to exit the cab, such as when a train broke in two in transit. *Id*. at 36:2-22. Plaintiff explained "even then, most cases [he] never had to ride a car. [He] could always put the train back together while on the ground." *Id*.

Plaintiff knew of the basic safety risks associated with his job, including "slips, trips, and falls." Walsh Decl., Ex. A at 39:1. Regarding moving cars, plaintiff explained that "[s]ituation awareness is important out there because people can get coupled up," which refers to the scenario where an employee is "caught between two knuckles and boxcars." *Id*. at 39:2-40:1. Plaintiff recalled "a gentleman that had his arm amputated" due to an incident the first year he was hired on. *Id*. at 39:4-6. Other safety risks for brakemen include falling off ladders on train cars, which may cause "serious or fatal injury." Walsh Decl., Ex. C, at 67:11-24.

Union Pacific requires brakemen to meet certain physical requirements detailed in its Trainman Job Description:

> Must have sufficient strength, flexibility, aerobic capacity, range of motion, and endurance to perform the physical requirements of the job to include: push/pull and lift/carry up to 25 lbs. (frequently), 50 lbs. (occasionally), and move weights up to 84-87 lbs. (rarely). Position requires use of upper extremities and ability to grip bilaterally and bilateral manual dexterity. Ability to maintain 3-point contact (both feet and one hand or both hands and one foot) when holding on to the ladder or car. Must have balance and coordination to climb ladders and stairs. Walk on ballast and ground (occasionally to frequently dependent upon job assignment). Must be ability to bend and stoop (occasionally). Must be able to maintain balance and coordination while climbing on ladders 12 feet or more and stairs (occasionally). Walking

on ballast and ground (frequently).   Working 12 feet or more above ground (occasionally).   Bend or stoop to inspect and adjust equipment (occasionally).

Walsh Decl., Ex. B, at UP-83 (emphasis added).   Moreover, Union Pacific requires brakemen to be "able to climb and work at elevations more than 12 feet." *Id*.   Plaintiff confirmed that he would frequently climb ladders, although he stated that he was climbing at heights ranging from eight to ten feet, instead of twelve feet.   Walsh Decl., Ex. A, at 42:2-8

## II.    Defendant's Fitness for Duty Policy

In 2019, Dr. Holland, Union Pacific's former Chief Medical Officer, served as head of its Health and Medical Services Department ("HMS").   Walsh Decl., Ex. C, at 10:2-5.   HMS oversees Union Pacific's Fitness for Duty ("FFD") review process.   *Id*. at 15:6-14.

Union Pacific assesses whether an employee's condition poses an "unacceptable risk" based on what plaintiff calls "the 1% policy," which states that HMS must issue workplace restrictions where an employee's risk of "sudden incapacitation" is above 1% per year.   Barney Decl., Ex. A. at 79:19-80:1; 61:3-15; UPRR Medical Comments History, ECF 31-9 at UP-88.

For brakemen and conductors, HMS developed a set of standard restrictions for employees with an "unacceptable risk of sudden incapacitation."   Walsh Decl., Ex. C at 61:3-20.   Employees with a "risk of sudden incapacitation" include those who work in "a hazardous setting or doing something potentially hazardous like climbing at great heights or working with dangerous equipment."   *Id*. at 60:14-25.   If a

brakeman's medical condition posed a recurring risk "above 1 percent per year, which is [defendant's] acceptable risk of sudden incapacitation," *id*. at 79:19-80:1, then HMS required the appropriate medical restrictions for the employee. *Id*. at 61:3-15.

Dr. Holland stated that the FFD process ensures that Union Pacific's employees are medically fit to perform their essential job duties, including that employees do not have medical conditions posing an unacceptable risk to themselves or others while at work. Walsh Decl., Ex. C at 37:1-6. FFD processes may be initiated for several reasons, including an employee's report of a triggering medical condition. *Id*. at 38:11-21. HMS automatically initiates a FFD process for employees who are absent on medical leave for more than thirty days. *Id*. at 38:22-25.

Under that automatic review, HMS evaluates the employee's complete medical record and may initiate an independent medical review if additional medical information is needed. *Id*. at 47:13-25. Most of the time, HMS makes a medical evaluation based on the pre-existing medical record. *Id*. at 51:1-5. In other cases, HMS refers the case to medical consultants for a medical file review of the information to assist with the medical determination. *Id*. at 51:15-18. Dr. Holland stated that this process is individualized towards the employee's specific position and job requirements:

> "[W]e do an individualized evaluation of the employee in fitness-for-duty evaluations, and that includes course and individualized evaluation of their medical status and functional abilities. And we also did an individual evaluation of their particular work duties and safety risks. . ."

*Id*. at 60:4-9. The majority of Union Pacific's employees who undergo a FFD process eventually return to their original positions. *Id*. at 62:7-16.

## III. Plaintiff's Injury

On January 22, 2019, plaintiff fell while working on his farm and injured his right shoulder. Barney Decl., Ex. D at 42:19-25; Sky Lakes Medical Records, ECF No. 31-4 at UP-247.) Plaintiff presented at the ER, where Dr. Eric Brunswick diagnosed him with an anterior right shoulder dislocation. ECF No. 31-4 at UP-255. Dr. Brunswick obtained X-Rays, performed a closed reduction of the right shoulder, and placed plaintiff in a shoulder immobilizer. *Id*. Dr. Brunswick did not order or obtain any additional medical imaging. *Id*. at UP-250. In his notes, Dr. Brunswick stated that plaintiff appeared to have both a Hill-Sachs and Bankart lesion associated with the injury. *Id*. Plaintiff was discharged with instructions to seek follow up care and attend physical therapy. *Id*. at UP-255.

Plaintiff sought care from orthopedist, Dr. Kevin Heaton from January 28, 2019, to June 26, 2019. Barney Decl., Ex. E. During that period, plaintiff also underwent regular physical therapy. *Id*. at GRANAS-112. Dr. Heaton confirmed the diagnosis of a shoulder dislocation, and his office performed additional X-Rays of plaintiff's shoulder, where Dr. Heaton identified a Hill-Sachs. *Id*. at GRANAS-101-03. By March 20, 2019, Dr. Heaton concluded that the Hill-Sachs lesion was healed. *Id*. at GRANAS-112-14. Dr. Heaton did not find evidence of a Bankart lesion. *Id*. at GRANAS-11-13; Barney Decl. Ex. A, at 98:4-10. On April 22, 2019, Dr. Heaton provided his opinion that plaintiff was able to return to work. Barney Decl., Ex. F.

On June 26, 2019, Dr. Heaton's treatment notes state his recommendation that plaintiff "continue with exercise strengthening and range of motion exercises" and that plaintiff "can continue regular work activities." Barney Decl. Ex. E at 120. Dr. Heaton noted plaintiff's reports that he was working construction jobs and feeling well. *Id*. at 118.

Plaintiff discontinued his physical therapy on July 31, 2019. His provider stated that plaintiff demonstrated "some further improvement" and that plaintiff cancelled his second to last few appointments and failed to attend his last appointment. Walsh Decl., Ex. N at GRANAS-98. Plaintiff's physical therapist discharged him after that. *Id*.

In 2021, in a letter requested by plaintiff's medical expert, Dr. Kevin Trangle, hired for this lawsuit, Dr. Heaton stated that, based on the nature of plaintiff's injury and recovery, he "did not feel that surgical intervention was necessary." *See* ECF No. 31-15 (Ex. A to expert report). Dr. Heaton further stated:

> "Upon my last follow-up evaluation I did not see any significant deficits or significant loss of motion or strength limitation that I felt would impair this patient's ability to resume his regular and normal work as a railroad brakeman.

> ". . . [A]t this patient's time of injury he was 57 years old, excellent physical condition, and did not feel that surgical intervention was indicated. The risk of redislocation in this age group is quite nominal with appropriate rehabilitation and conditioning for which he had performed quite vigilantly. Therefore I felt at the time of discharge patient had no significant risk or redislocation, found no evidence of clinical instability nor had any reports of subjective instability.

> ". . . In my opinion based on overall reports from the literature this patient may be at a slight but not significant risk of redislocation (0-10%), but considering his physical nature, compliance with therapy

and overall physical conditioning I do not feel that he is at any greater
or significant risk of dislocation then (sic) the "general public" at his age
group."

*Id.*

After reviewing Dr. Heaton's assessment that, based on literature, there was
a slight risk of redislocation of 0-10%, Dr. Trangle opined that plaintiff could return
to work without restriction, concluding that plaintiff's "risk for recurrent dislocation
is exceedingly low. *See id.* (Expert Report at 15). In Dr. Trangle's opinion, on the
plaintiff's risk was "**considerably less than 1%.**" *Id.* Dr. Trangle also determined
"The evidence establishes that [plaintiff] was definitely fit for duty from a medical
standpoint." *Id.* at 16.

## IV. Defendant's Fitness for Duty Assessment

In April 2019, defendant initiated plaintiff's fitness for duty review. *See* Union
Pacific Medical Comment History, ECF No. 31-9 at UP-96. Associate Medical
Director, Dr. John Charbonneau, performed a medical records review of plaintiff's
emergency room records, Dr. Heaton's treatment records, described above, and
plaintiff's physical therapy notes. Barney Decl., Ex. A at 118:1-8. Dr. Charbonneau
did not examine plaintiff or contact plaintiff's medical providers concerning plaintiff's
treatment and recovery. *Id.* at 89:6-22; Barney Decl., Ex. H at 19:2-4.

On May 17, 2019, HMS issued initial medical restrictions prohibiting plaintiff
from climbing ladders in his brakeman position. Walsh Decl., Ex. H at UP-328. These
restrictions included that plaintiff (1) "may not climb vertical ladders, e.g., on the side
of railcars. He may climb onto locomotive units"; and (2) "may not stand on vertical

ladders during railcar movements." Walsh Decl., Ex. I at UP-95. Dr. Charbonneau explained this restriction was appropriate because of the increased risk of recurring shoulder injuries:

> "Even after appropriate orthopedic care there is an increased risk of recurrent shoulder instability following a shoulder dislocation. This can create an unacceptable increased risk of serious injury if the employee were to experience recurrent instability while performing certain functions of his regular job duties as a Brakeman."

*Id*. In its letter, HMS invited plaintiff to discuss whether he believed any reasonable accommodations were available to allow him to continue to work in his brakeman position. Walsh Decl., Ex. H at UP-328.

On May 28, 2019, plaintiff and HMS personnel, including Dr. Charbonneau and Nurse Bridgette Ziemer, discussed the possibility of plaintiff's return to work. Walsh Decl., Ex. I at UP93. Plaintiff said he believed he could return to work, given that he was currently working on his ranch, including "climb[ing] ladders while holding a 100+ [pound] sack." *Id*. Dr. Charbonneau explained, however, that "strength [was] not the reason for the restrictions." *Id*. Instead, the issue was the "risk of future recurrent instability episodes . . . which [was] a major concern given his work as a brakeman," including specifically, "climbing on the side of cars, tying hand brakes, and riding on the side of cars." *Id*. Although Plaintiff explained that his physician advised him that this risk was "relatively lower" and "slim to none," Dr. Charbonneau explained that there was "still some risk of recurrent instability." *Id*.

As for accommodations, plaintiff asked whether he could continue in his position if he used a "brakestick," and HMS agreed to discuss this possibility with

plaintiff's regional case manager, Kimberly Foye. Walsh Decl., Ex. I at UP-93. On May 29, 2019, Ms. Foye discussed use of a brakestick to accommodate plaintiff's restrictions with plaintiff's superiors. *Id*. at UP-92-93. They determined that while plaintiff "could use the brakestick" and "brakesticks were available," because of "the location where [plaintiff] was," the climbing restriction could not be accommodated because there may not always be an "opportunity to walk alongside the car." Walsh Decl., Ex. J at 99:1-8.

The restrictions were considered permanent. When defendant determined plaintiff could not be accommodated, plaintiff was removed from his trainman position permanently. ECF No. 31- 8; EFC No. 31-9 at UP-95. Dr. Charbonneau stated that despite Dr. Heaton's assessment concerning plaintiff's risk of future dislocation and ability to return to work, he "didn't agree with it by virtue of the way we handle such cases." Barney Decl., Ex. H, at 20:9-22. Dr. Charbonneau confirmed that it is defendant's policy that, when an employee sustains a shoulder dislocation, that employee would not be permitted to return to train service work without restrictions, regardless of the employee's individual history or opinions of medical providers. Barney Decl., Ex. H at 29:6-30:7.

## V.    Plaintiff's Request for Reconsideration

After being issued permanent work restrictions, plaintiff requested that defendant reconsider the outcome of its fitness for duty review. On July 17, 2019, Dr. Holland sent a letter to orthopedic surgeon, Dr. Phillip Streubel, requesting review of plaintiff's medical files. ECF No. 32-1. Dr. Holland instructed Dr. Streubel to

determine the appropriate diagnoses and whether it was probable that plaintiff was at greater than 1% risk per year of redislocation, and whether it is probable that surgical repair would reduce the risk of redislocation  *Id*.  Dr. Holland asked Dr. Streubel not to provide his opinion about the employee's ability to perform specific job duties.  *Id*.  Accordingly, Dr. Streubel stated that his role was to determine whether the risk of redislocation was greater than 1 percent in a year, not whether a person is allowed to go back to work on a railcar, which was defendant's decision. Barney Decl. Ex. I at 46:8-15.  In short, Dr. Streubel concluded that "somebody who had a shoulder dislocation is at a higher than 1[%] yearly rate of re-dislocation." Walsh Decl., Ex. K at 46:9-13.

## VI.    Defendant's Final Determination

On October 3, 2019, Dr. Holland reviewed Dr. Streubel's assessment of plaintiff's medical condition.  Walsh Decl., Ex. I, at UP-88.  Dr. Holland noted that the "studies that I have seen in the past . . . consistently they show between 30 and 60 percent or more of people that have this injury will suffer a redislocation in the first five years afterwards."  Walsh Decl., Ex. C at 69:5-10.  Dr. Holland stated that there are unique risks of a recurrent dislocation causing sudden incapacitation that exist for brakemen, especially considering ladder climbing which requires overhead reaching and rotating the arm, placing stress on the shoulder posing a risk for dislocation.  *Id*. at 67:11-24.  And if the shoulder becomes unstable and the employee falls, they are at serious risk for fatal injury.  *Id*.

On October 10, 2019, after defendant notified plaintiff of his permanent restrictions, Ms. Foye reviewed the restrictions over a phone call with plaintiff, and informed him that he may submit new medical information for reconsideration at any time. Walsh Decl., Ex. I at UP-87. Plaintiff indicated that he was interested in working with defendant's Vocational Management team to explore possible job options. *Id*. Plaintiff stated that it "seemed to" him that "Ms. Foye was genuinely trying to help" him. Walsh Decl., Ex. A, at 60:14-15.

Throughout October and November 2019, defendant attempted to connect with plaintiff regarding possible job options. Walsh Decl., Ex. I at UP-87. However, in December 2012, plaintiff's assigned vocational counselor, Robert Gaffney, noted that plaintiff was working "6 to 6 Monday through Friday" in construction, and that defendant had been unable to provide significant services. *Id*. Defendant again attempted to contact plaintiff but was unsuccessful. *Id*. Plaintiff stated that he would have liked to continue his employment with defendant, but that he was "[w]orking on the construction site Monday through Friday," and could not return Mr. Gaffney's email or calls. Walsh Decl., Ex. A, at 56:19-20, 58:1-21. Plaintiff did not submit any other further medical treatment records. *Id*. at 47:14-16.

### LEGAL STANDARD

Summary judgment is appropriate where, as here, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The Court must construe the evidence in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"[T]he plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Santillan v. USA Waste of California*, 853 F.3d 1036, 1042 (9th Cir. 2017) (citation omitted). The Ninth Circuit has set a high standard for summary judgment in employment cases because the ultimate question of discrimination "is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996) (internal quotation marks omitted); *see also Mays v. United Ass'n Loc. 290 Apprenticeship & Journeymen Training Tr. Fund*, 407 F. Supp. 3d 1121, 1143 (D. Or. 2019) ("[s]ummary judgment is disfavored in employment discrimination cases.").

## DISCUSSION

Plaintiff filed an Amended Complaint on February 19, 2021, ECF No. 13, alleging five claims: (1) disability discrimination in violation of the ADA; (2) unlawful screening in violation of the ADA; (3) failure to accommodate in violation of the ADA; (4) disability discrimination in violation of ORS § 659A.112; and (5) failure to accommodate in violation of ORS § 659A.112.

## I.    Disability Discrimination Claims under the ADA and Oregon State Law

Plaintiff's first and fourth causes of action allege claims for disability discrimination under the ADA and ORS. § 659A.112, respectively.   Disability discrimination claims under ORS. § 659A.112 are functionally equivalent to ADA claims, and both claims may be assessed together.  *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001).

To state a claim for disability discrimination, a plaintiff must allege that they are (1) disabled within the meaning of the statute; (2) a qualified individual able to perform the essential functions of the job; and that they (3) suffered an adverse employment action because of their disability.  *Rood v. Umatilla Cnty.*, 526 F. Supp. 2d 1164, 1174 (D. Or. 2007) (citations omitted).

Here, the parties do not appear to dispute that plaintiff was disabled under the statute or that he suffered an adverse employment action based on that disability. Instead, the parties disagree whether plaintiff was a "qualified individual."

Under the ADA an employer is prohibited from "discriminating against a qualified individual on the basis of disability in regard to . . . discharge of employees,

[and] other terms, conditions, and privileges of employment." 42 U.S.C. § 1211(a). The plaintiff has the burden of proving that they are a "qualified" individual able to perform the essential functions of the job with or without a reasonable accommodation. *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999). To be considered qualified, an individual must satisfy the "prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." 29 C.F.R. § 1630.2(m).

Here, under the framework to evaluate whether a plaintiff was qualified, neither party appear to disagree about whether plaintiff satisfied the skill and experience requirements for the job.    The parties ultimately disagree whether plaintiff could perform the "essential functions" of the trainman position. Def.'s. MSJ at 22; Pl.'s Resp. at 15.   Defendant contends that plaintiff cannot perform the essential functions of a trainman because his medical condition, in defendant's view, exceeded a 1% reoccurrence rate.   Defendant contends that plaintiff's doctors were not aware of defendant's 1% policy, and therefore, their assessment that plaintiff could return to work is not correct.   Defendant also points to Dr. Heaton's statement that plaintiff's recurrence rate may be as high as 10%.   Plaintiff points to evidence he produced that his physicians found "no gross instability" in his shoulder and that they cleared him for work.  Plf.'s Resp. at 16.   Further, that Dr. Trangle opined that his risk was far less than 1%. *Id.*

The Court finds that plaintiff and defendant have presented conflicting evidence demonstrating a triable issue of fact as to whether plaintiff is "qualified" to

work under defendant's 1% policy. Whether it was reasonable for defendant to rely on its own physician's review remains a question for a jury.

Defendant also argues that, even if plaintiff is a qualified individual, summary judgment is appropriate because plaintiff poses a "direct threat." Def's. MSJ at 23. The direct threat defense is an affirmative defense for which a defendant bears the ultimate burden of proof. *Echazabal v. Chevron USA, Inc.*, 336 F.3d 1023, 1027 (9th Cir. 2003). An employer must also present evidence that, at the time is issued the adverse decision, it considered the primary factors in the direct threat analysis: "(1) The duration of the risk; (2) [t]he nature and severity of the potential harm; (3) [t]he likelihood that the potential harm will occur; and (4) [t]he imminence of the potential harm." 29 C.F.R. § 1630.2(r); *Echazabal*, 336 F.3d at 1031. The employer must prove that the plaintiff's medical condition created a substantial risk of harm "beyond that faced by other workers[]". *Id*. at 1029. An employer cannot prevail on the defense merely because some risk exists; rather, the risk must be significant. *Doe v. An Oregon Resort*, No. 98-6200-HO, 2001 WL 880165, at *6 (D. Or. May 10, 2001) (citing *Bragdon v. Abbott*, 524 U.S. 625, 649 (1998)).

Defendant is unable to meet the heavy burden of proof required of the direct threat affirmative defense. As stated above, factual questions exist concerning plaintiff's actual risk of sudden incapacitation as a result of redislocation following his shoulder injury, and therefore, whether plaintiff posed a "significant risk" to himself or others in the position. Here, Dr. Heaton and Dr. Trangle both opine that plaintiff is at no increased risk of redislocation in comparison to the general

population. ECF No. 31-15 at 30.   The consistent opinions of plaintiff's treating physician here are enough to establish a triable issue as to the duration of risk, likelihood that harm will occur, and the imminence of that harm.  See 29 C.F.R. § 1630.2(r).  Accordingly, defendant's motion is denied as to plaintiff's first and fourth claims.

## II.    Unlawful Screening

The ADA prohibits "using qualification standards, employment tests, or other selection criteria that screen out or tend to screen out an individual with a disability[.]"   42 U.S.C. § 12112(b)(6).   Qualification standards include "medical, safety and other requirements established by [an employer] as requirements [] to be eligible for the position held[.]"  29 C.F.R. § 1630.2(q).

An employer may only use said standard, test, or selection criteria if it is shown to be job related and consistent with business necessity.  42 U.S.C. § 1211(b)(6).  An employer may assert a "business necessity" affirmative defense to a disability discrimination claim that application of a qualification standard, test or selection criteria discriminates on the basis of disability.  *See* 42 U.S.C. § 12113(a); *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 568 (1999).  The business necessity standard is met if the employer "is faced with significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Brownfield v. City of Yakima*, 612 F.3d 1140, 1146 (9th Cir. 2010) (quotation omitted).

The employer has the burden of proving that its screening standard satisfies the business necessity defense.  *See Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th

Cir. 2001) (internal citations omitted).  "The 'business necessity' standard is quite high, and 'is not [to be] confused with mere expediency.'"  *Id.* (quoting *Bentivegna v. United States Dep't of Labor*, 694 F.2d 619, 621-22 (9th Cir. 1982)) (alteration in original).  In the Ninth Circuit, the business necessity defense is rarely demonstrated and courts have "had little occasion to apply [the defense]."  *Cripe*, 261 F.3d at 890 (quoting *Yin v. California*, 95 F.3d 864, 868 (9th Cir. 1996)).

To assert this defense, the employer must show "that the qualification standard is (1) 'job related,' (2) 'consistent with business necessity,' and (3) that 'performance cannot be accomplished by reasonable accommodation.'"  *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 995 (9th Cir. 2007) (citing 42 U.S.C. § 12113(a)).  To show "job-relatedness", an employer must demonstrate that the qualification standard fairly and accurately measures the individual's actual ability to perform the essential functions of the job.  *See Cripe*, 261 F.3d at 890.  To show that the disputed qualification standard is "consistent with business necessity," the employer must show that it substantially promotes the business' needs.  *Id.* at 890.

And to show that "performance cannot be accomplished by reasonable accommodation," the employer must demonstrate either that no reasonable accommodation currently available would cure the performance deficiency or that such reasonable accommodation poses an undue hardship on the employer.  *Bates*, 511 F.3d at 996-97.

Here, plaintiff alleges that defendant violated the ADA by "imposing selection criteria, including medical screening, that screens out or tends to screen out

individuals with disabilities." Plf.'s Resp. at 27. Defendant contends that "the safety of employees and protecting employees and property from harm substantially promotes Union Pacific's business needs." Def.'s MSJ at 29.

Defendant has not produced evidence that its 1% policy *accurately* measures the individual's *actual ability* to perform the essential functions of the job. *See Cripe*, 261 F.3d at 890. Plaintiff pointed to evidence that Dr. Charbonneau confirmed that it is defendant's policy that, when an employee sustains a shoulder dislocation, that employee would not be permitted to return to train service work without restrictions, regardless of the employee's individual history or opinions of medical providers. Barney Decl., Ex. H at 29:6-30:7. Accordingly, the record demonstrates a material fact in dispute whether defendant's 1% policy is "job-related."

And defendant has not produced evidence that its 1% policy "substantially promotes" its needs. Defendant identifies its need to "protect employees and property from harm," but does not provide supporting evidence demonstrating that this particular 1% standard was necessary, or the absence of a different, less discriminatory applicable evaluation criteria. *See Rohr v. Salt River Project Agriculture Imp. and Power Dist.*, 555 F.3d 850, 863 (9th Cir. 2009) (applying same reasoning). Further, the record does not contain "significant evidence" that would cause a reasonable person to ask whether plaintiff was capable of performing his job." *Brownfield*, 612 F.3d at 1146.

Last, defendant must show that "performance cannot be accomplished by reasonable accommodation." *Bates*, 511 F.3d at 996. Defendant must show that

either no reasonable accommodation currently available would cure the deficiency, or that any such accommodation would pose an "undue hardship" on the company. *Id*. at 996-97.  Here, factual issues remain, where plaintiff points to his ability to use a brakestick and explains that his work may be properly conducted from the ground without gripping ladders to make adjustments on the train and defendant states that train track locations and weather prevent using the brakestick.

The Court finds that the question whether plaintiff's job cannot be accomplished with reasonable accommodation "is one that can only be resolved through a searching inquiry upon a full record."  Here, that has not been enough factual development to find that defendants have met their burden to show that no accommodation was available or that any accommodation would pose an undue hardship.

Accordingly, defendant has not shown, as a matter of law, that its 1% policy is not selection criteria that screens out or tends to screen out an individual with a disability.  42 U.S.C. § 12112(b)(6).  Therefore, defendant's motion for summary judgment is denied as to plaintiff's second claim for relief.

## III.  Failure to Accommodate

The ADA "prohibits an employer from discriminating against a qualified individual with a disability by failing to make reasonable accommodations to the known physical or mental limitations of that individual."  *Willis v. Pacific Maritime Ass'n*, 236 F.3d 1160, 1164 (9th Cir. 2001) (internal quotations omitted).  The employer and employee must engage in an interactive process to determine whether

the employee's disability can be accommodated. *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1111 (9th Cir. 2000). The employee has "the burden of showing the existence of a reasonable accommodation that would have enabled him to perform the essential functions of an available job." *Dark v. Curry Cty.*, 452 F.3d 1078, 1088 (9th Cir. 2006).

To prevail at summary judgment on this claim, an employer must show that there is "no genuine dispute that the employer has engaged in the interactive process in good faith." *Witt v. Nw. Aluminum Co.*, 177 F. Supp. 2d 1127, 1133 (D. Or. 2001) (citing *Barnett*, 228 F.3d at 1116). "[B]oth the employer and the employee have a duty to engage in an interactive process under the ADA; an employer cannot be faulted if after conferring with the employee to find possible accommodations, the employee then fails to supply information that the employer needs or does not answer the employer's request for more detailed proposals." *Deibele v. USF Reddaway, Inc.*, No. CIV. 98-1597-HA, 2000 WL 968813, at *5 (D. Or. Feb. 16, 2000).

Here, plaintiff argues that defendant failed to engage in the interactive process because it declined to accommodate plaintiff's accommodations request. Though defendant ultimately denied plaintiff's specific accommodation requests—and the lawfulness of that denial remains an issue for the factfinder on plaintiff's unlawful screening claim—defendant argues that it nevertheless engaged in a thoughtful, interactive discussion with Ms. Foye and plaintiff's superiors concerning plaintiff's accommodation options. Futher, that when defendant determined those were not available consistently attempted to follow up with plaintiff concerning his employment options.

Here, the facts, recounted earlier, are undisputed: Foye discussed the brakestick idea with plaintiff's field supervisors, who ultimately concluded that the brakestick would not alleviate the concerns posed by the ladder-climbing restriction. Defendant then met with plaintiff and explained this decision and several months later, after defendant issued its final restrictions to plaintiff, Ms. Foye and Union Pacific's Vocational Management Team reached out to him to discuss whether he was interested in assistance with finding a replacement position, either within Union Pacific or at another company. Noted above, plaintiff described Foye as "genuinely trying to help him." ECF No. 31-1, at 20:13- 15. Plaintiff did not follow up with defendant because he was working on the construction site Monday through Friday. Defendant did not close the file until multiple communication attempts elapsed to which plaintiff failed to respond.

The Court finds that defendant engaged in the interactive dispute process and plaintiff has not pointed to any evidence of bad faith. Defendant is entitled to summary judgment on plaintiff's third claim for relief.

## CONCLUSION

Defendant's Motion for Summary Judgment, ECF No. 30, is GRANTED in part and DENIED in part, consistent with this Opinion.

IT IS SO ORDERED.

Dated this 21st day of September 2023.

/s/Ann Aiken

Ann Aiken
United States District Judge