IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

**MARK GRANAS**,

    Plaintiff,

  v.

**UNION PACIFIC RAILROAD
COMPANY**,

    Defendant.

Civ. No. 1:21-cv-00116-AA

**OPINION AND ORDER**

_____

AIKEN, District Judge:

 Plaintiff Mark Granas brought claims for disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., and its state equivalent, ORS § 659A.112, against his former employer, Defendant Union Pacific Railroad. After a one-week trial, a unanimous jury found Union Pacific had violated the ADA and Oregon law by discriminating against Plaintiff based on his disability and by applying criteria that screens out or tends to screen out individuals with a disability. The jury awarded damages which included an advisory verdict for back pay and punitive damages. Based on the evidence at trial, the Court finds that Plaintiff shall be awarded $509,849 in back pay and $25,000,000 in punitive damages.

## PROCEDURAL BACKGROUND

The Court's factual findings are set forth below from the evidence and testimony presented at trial. As introduction, Union Pacific terminated Plaintiff after he dislocated his shoulder. While Plaintiff's physicians found him physically fit to return to work, Union Pacific placed permanent restrictions on Plaintiff that prohibited him from returning to his job because of his shoulder dislocation. Plaintiff sued for disability discrimination under state and federal law.

### A.     Pre-trial Background

At the summary judgment stage, Union Pacific moved against all claims. The Court denied Union Pacific's motion on Plaintiff's first and fourth claims for relief for "disability discrimination" under federal and state law. Order on. Mot. at 14-17, ECF No. 37. The Court also denied Union Pacific's motion on Plaintiff's second claim for "unlawful screening" under the ADA. *Id*. at 17-20. The Court granted Union Pacific's motion on Plaintiff's third claim for relief for reasonable accommodation, finding that, though it ultimately denied Plaintiff's specific accommodation requests—and the lawfulness of that denial remained factually in dispute in Plaintiff's other claims—Union Pacific nevertheless engaged in an interactive discussion concerning other work away from his job, sufficient to grant summary judgment discreet to Plaintiff's reasonable accommodation claim. *Id*. at 20-21.

The Court encouraged settlement, but after negotiations proved unsuccessful, the case proceeded to trial on Plaintiff's first and fourth claims for relief for "disability

discrimination" under federal and state law and on Plaintiff's second claim for "unlawful screening" under the ADA.

At the pretrial conference, Union Pacific moved to bar from the jury's consideration the issue of punitive damages, arguing that Plaintiff had produced no evidence warranting such damages. ECF No. 63 at 9; ECF No. 67 at 3. The Court advised Union Pacific to make a motion at trial on the issue of punitive damages and that the Court would rule based on evidence presented at trial. Pretrial Tr. at 14:17-19. The Court excluded any evidence of Union Pacific's profits unless and until it ruled on whether the jury would hear evidence of punitive damages. *Id*. at 32:21-33:2.

Union Pacific also moved to exclude evidence of back pay, asserting that it is an equitable remedy for the Court, not the jury, to award. ECF No. 63 at 4-5. Union Pacific proposed having a separate bench trial on remedies, *id*., but the Court determined that judicial economy favored allowing testimony about back pay alongside testimony about Plaintiff's other alleged damages. Pretrial Tr. 9:18-10:23, ECF No. 91; Pretrial Or. at 2-3, ECF No. 87.

Notwithstanding that all evidence would be heard together at trial, the Court explained that the jury's award of back pay and punitive damages, if any, would be advisory, citing Federal Rule of Civil Procedure 39. Pretrial Tr. 10:20-22.

### B.    *Trial Background and Jury Instructions*

At trial, after Plaintiff rested his case, Union Pacific moved for a directed verdict on all Plaintiff's claims and on the issue of punitive damages under Rule 50(a). ECF No. 98; Trial Tr. at 645; Fed. R. Civ. P. 50(a). Plaintiff also moved for a directed

verdict on his claims. Trial Tr. at 651. The Court denied both parties' motions, determining that more than one reasonable conclusion could be drawn from the evidence at trial, precluding judgment as a matter of law. Trial Tr. at 647:10, 650:23; 654:12; 655:22.

The Court then held a conference for counsel to discuss and propose revisions to jury instructions. Trial Tr. 611:2-22; 676:1-10. On the record, Union Pacific objected to the Court's inclusion of an instruction about punitive damages, arguing that the issue of punitive damages should not go to the jury. *Id*. at 792:1-9.

Union Pacific also objected to the Court's decision to strike its proposed instruction about the business judgment rule defense. *Id*. at 792:1-9. The Court found Union Pacific's proposed instruction about the business judgment rule was inapplicable to the facts of the case and legally incorrect. *Id*. at 792:12-18. Union Pacific also objected to the verdict form, arguing that the form should not ask the jury whether Union Pacific was liable under federal law *and* under state law. *Id*. at 793:2-24. The Court determined that the verdict form should include questions about both claims, because Plaintiff had pleaded them separately and the risk of an inconsistent verdict was low. *Id*.

### C.    *Jury Verdict and Award of Damages*

After several hours of deliberation, the jury found unanimously on all Plaintiff's claims. First, the jury found that Plaintiff was a "qualified individual" with a disability who, either with or without a reasonable accommodation, could perform

the essential functions of the job he had at Union Pacific. Jury Verdict Form ("JVF") at 1 (question 1), ECF No. 104.

Next, the jury found that Union Pacific discriminated against Plaintiff because of his disability under the ADA and Oregon law when it removed Plaintiff from his job and refused to allow him to return to it. *Id*. (questions 2 and 3).

Additionally, the jury found that Union Pacific discriminated against Plaintiff under federal law by imposing selection criteria that screens out, tends to screen out, or has a disparate impact on individuals who disclose disabilities. *Id*. at 2 (question 4). As to the railroad's affirmative defenses, the jury found that Union Pacific did not prove its "direct threat" defense or its "business necessity" defense. *Id*. (questions 5 and 6).

To "fairly and adequately" compensate Plaintiff, the jury awarded past wages to present (back pay) in the amount of $509,849; future wages (front pay) in the amount of $443,014; and noneconomic damages of $1,000,000. *Id*. at 3 (question 7).

The verdict form also asked "[s]hould [Union Pacific] pay punitive damages?" to which the jury answered "[y]es." *Id*. (question 8). As to "what amount of punitive damages" Union Pacific should pay, the jury wrote "25 million." *Id*. (question 9). The jury had been instructed as to punitive damages as follows:

> If you find for Plaintiff, you may, but are not required to, award punitive damages. The purposes of punitive damages are to punish a defendant and to deter similar acts in the future. Punitive damages may not be awarded to compensate a plaintiff. Plaintiff has the burden of proving by a preponderance of the evidence that punitive damages should be awarded and, if so, the amount of any such damages. You may award punitive damages only if you find that Defendant's conduct that harmed

Plaintiff was malicious, oppressive or in reckless disregard of Plaintiff's rights.

Conduct is malicious if it is accompanied by ill will, or spite, or if it is for the purpose of injuring Plaintiff. Conduct is in reckless disregard of Plaintiff's rights if, under the circumstances, it reflects complete indifference to Plaintiff's safety or rights, or if Defendant acts in the face of a perceived risk that its actions will Plaintiff's rights under federal law.

An act or omission is oppressive if Defendant injures or damages or otherwise violates the rights of Plaintiff with unnecessary harshness or severity, such as by misusing or abusing authority or power or by taking advantage of some weakness or disability or misfortune of Plaintiff. If you find that punitive damages are appropriate, you must use reason in setting the amount.

Punitive damages, if any, should be in an amount sufficient to fu1fill their purposes but should not reflect bias, prejudice, or sympathy toward any party. In considering the amount of any punitive damages, consider the degree of reprehensibility of Defendant's conduct.

Jury Instructions at 21, ECF No. 102.

As explained, for the jury's award of damages, two amounts were advisory: the $509,849 in back pay and $25,000,000 in punitive damages.

The Court allowed post-trial briefing from the parties on the two advisory awards and allocation of damages. ECF No. 107. The parties each submitted a supplemental brief and response. ECF Nos. 16, 19, 20, 21. In addition to providing supplemental briefing on damages, Union Pacific challenges the sufficiency of the evidence on all Plaintiff's claims.

## LEGAL STANDARD

Under Rule 52, in an action tried on the facts with an advisory jury, the court must find the facts specially and state its conclusions of law separately. Fed. R. Civ.

P. 52(a)(1). The findings and conclusions may be stated on the record after the close of the evidence or, as here, may appear in an opinion or a memorandum of decision filed by the court. *Id*. The court need not include each fact presented through every witness. *See Colchester v. Lazaro*, 16 F.4th 712, 727 (9th Cir. 2021) (explaining that Rule 52(a) does not require the district court to base its findings on each and every fact presented at trial). Judgment must be entered under Rule 58. *Id*.

Plaintiff has the burden of proof by a preponderance of the evidence. 42 U.S.C. § 12112(a); *see also Costa v. Desert Palace, Inc*., 299 F.3d 838, 857 (9th Cir. 2002) (en banc), *aff'd*, 539 U.S. 90 (2003) (it is employee's burden of proof to show by a preponderance of the evidence that the challenged employment decision was because of discrimination).

## FINDINGS OF FACT

### A.    *Historical Facts*

1.      Plaintiff testified about his background leading up to the actions giving rise to this case. The Court finds Plaintiff's testimony credible.

2.      Plaintiff moved to Klamath Falls, Oregon as a child. During part of his teenage years, he lived on his own in a tent, having only himself to rely on. Trial Tr. at 43:21-44:25. During high school, he took on a host of odd jobs, including as a dishwasher in a restaurant, splitting and selling firewood, and picking strawberries. *Id*. at 44:7-45:10.

3.      A family learned of Plaintiff's plight, and were kind enough to let Plaintiff live with them until he finished high school. *Id*. The family who took him in

knew a ranch owner looking for workers and recommended Plaintiff. The ranchers hired Plaintiff to cut and bale hay, move irrigation, feed cows, and mend fences. Plaintiff enjoyed the work so much that he determined that one day he would like to have his own ranch. *Id.* at 45:10-17.

4.     After graduating high school, Plaintiff served twenty years in the United States Army, including a deployment to Iraq. *Id.* at 46:12-47:10. Plaintiff was 39 years old when he came out of the military and was looking to begin a second career. He found that career at Union Pacific Railroad Company. *Id.* at 49:5-12.

5.     Plaintiff worked as a conductor and as a brakeman in the train yard. A brakeman is involved in moving trains from point A to point B and picking up train cars from various industries, such as tank cars, boxcars, grain cars, and lumber cars. *Id.* at 50:1-13. Plaintiff would break down local trains from the industries and put trains together for longer distance travels. It was rare for a brakeman to ride on the trains during long train routes *Id.* at 51:6-19.

6.     Plaintiff loved the job. He enjoyed the physical nature of the work, as well as working outdoors. He liked the people and the scenery. *Id.* at 51:20-52:2. Eventually, Plaintiff became a local chairman representing Union Pacific employees in claims for contract and wage disputes. *Id.* at 52:3-21. In all, Plaintiff worked for Union Pacific for sixteen years. *Id.* at 41:17-18.

7.     In 2005, Plaintiff met and later married his wife, Jennifer. They have two children and six grandchildren. *Id.* at 52:22-53:11; 215:24. After several years together, Plaintiff told his wife that, since working on a ranch as a younger man, he

had always wanted to have his own ranch. The couple started small with a few head of cattle, feeding them purchased hay, and after a while, determined they were ready to buy their own land to raise cattle and grow, bale, and cut their own hay. *Id.* at 54:6-55:15.

8.      Plaintiff created an organizational plan to start a self-sustaining ranch. The business model for the ranch required his income from Union Pacific. It was the primary resource necessary to start and maintain the ranch. *Id.* at 55:15-56:2; 221:1-6; 223:22-25. Income for railroad employees in Klamath Falls was very good—comparable to the salary of a medical doctor in that region. *Id.* at 56:7-10.

9.      The beginning years of the ranch—around 2016 to 2019—went well for Plaintiff. Hay prices were low, cattle prices were good, and he was earning income for calves. *Id.* at 56:18-25. Plaintiff rebuilt a lot of fences on his land. The fencing was made of metal T-posts that required him to physically drive each post into the ground using a steel tube with handles that covered each post. With his hands on the handles, Plaintiff physically forced all the fence posts into the ground. *Id.* at 59:16-60:9. Plaintiff built miles of fence line on his ranch. *Id.* at 60:15-16.

10.      During that same period, Plaintiff continued to work at Union Pacific full time and covered additional shifts for workers who called out sick or when weather related emergencies would arise. *Id.* at 57:1-58:13. At various times in the role of a brakeman or conductor, Plaintiff worked with different engineers. *Id.* at 59:4-10. He enjoyed the variability and camaraderie and made some good friends. *Id.* at 59:11-12.

11. In 2019, Plaintiff's primary role was that of train conductor, the job purpose for which is to assure safe, on-time, on-plan train operations and movement. *Id.* at 93:10-20. Each day before work, Plaintiff was required to sign off on a safety brief with information dependent on the operation planned for the day. Plaintiff took the safety briefing very seriously and frequently mentored younger employees on safety protocols. *Id.* at 96:15-97:6.

### B. *Plaintiff's Injury*

12. Plaintiff testified about the events leading up to his injury and about treatment for his injury. The Court finds Plaintiff's testimony credible.

13. On January 22, 2019, on Plaintiff's 55th birthday, he was loading a hay wagon before leaving for a two- or three-day Union Pacific trip to Eugene. *Id.* at 63:14-21; 64:5. He was loading up the hay wagon so his wife could tow it behind the tractor to feed the cows while he was away. The bales of hay were 100 or 120 pounds each and Plaintiff wanted to spare his wife from having to move the hay bales herself while he was away. *Id.* at 63:22-64:2.

14. While loading up the hay, Plaintiff stuck a hay hook into a bale to pull it up, expecting significant resistance. But there was no resistance. Loose hay came out of the bale and Plaintiff fell backwards into the hay wagon, landing on his right shoulder. *Id.* at 64:8-13. Plaintiff had his cell phone in his back pocket. He called his wife, who took him to the emergency room. *Id.* at 65:1-17.

15. At the emergency room, Plaintiff learned that he had dislocated his shoulder. *Id.* at 65:17-19.

16.    The doctor put Plaintiff's shoulder back in place. *Id.* at 65:22-66:4. Plaintiff was ultimately diagnosed with a right shoulder dislocation and the emergency room suspected a Hill-Sachs lesion or Bankart lesion, but no MRI was ordered to determine those suspicions. *Id.* at 182:2-6; 306:5-15. An MRI or a CT scan is typically required to determine the presence of a Bankart lesion. *Id.* at 306:9-20.

### C.    Testimony of Dr. Kevin Heaton - Plaintiff's Treating Physician

17.    Dr. Kevin Heaton testified about treating Plaintiff's shoulder. The Court finds his testimony credible. The Court also finds that the following testimony presented by or about Dr. Kevin Heaton is more probable than not.

18.    After his initial emergency room visit, Plaintiff became a patient of Dr. Heaton, an orthopedic surgeon known as a shoulder specialist in the region. *Id.* at 66:7-16; 367:2. Dr. Heaton had a general sense of the physical work required of train conductors, brakemen, and trainmen. He has treated around one hundred railroad employees and routinely evaluated them for release back to work safely according to their job duties. *Id.* at 368:6-20.

19.    Not all shoulder injuries are the same and treatment consideration involves evaluating the mechanism of dislocation, the patient's age, whether there was soft tissue or bony damage, and whether surgery is required. *Id.* at 369:15-20. For Plaintiff, Dr. Heaton determined that conservative treatment in conjunction with physical therapy was the proper course of treatment. *Id.* at 371:15-19.

20.    Dr. Heaton told Plaintiff he did not need shoulder surgery. *Id.* at 67:5-8. And whether Plaintiff had a Bankhart lesion or not became irrelevant because he did

not have any signs of instability, pain, or problems associated with a Bankhart-type lesion. *Id.* at 374:6-24.

21.    In accordance with a conservative treatment plan, Dr. Heaton prescribed sessions with a physical therapist. *Id.* at 66:23-67:4. Dr. Heaton did not feel the need to routinely review Plaintiff's treatment notes from his physical therapist after every session because the medical community is very small and he trusted that the physical therapist would reach out if Dr. Heaton's review was necessary. *Id.* at 376:23-377:13.

22.    When deciding to release a patient for work, it is important from a clinical standpoint to assess each patient as an individual to determine what they are capable of doing because every person is different, and every job is different. *Id.* at 378:3-15. Though Dr. Heaton did not review the text of an official job description for Plaintiff, he gleaned from Plaintiff what his work tasks involved, and the physical undertakings required to fulfil those tasks. *Id.* at 392:4-21

23.    Though Dr. Heaton continued seeing Plaintiff through June 2019, in April 2019, Dr. Heaton recommended Plaintiff's release to work without restrictions. *Id.* at 69:4-7. Specifically, after about three months of treatment and physical therapy, Dr. Heaton determined that Plaintiff was ready to return to working on trains and climbing ladders. At the end of his treatment with Dr. Heaton in June, Plaintiff had near-normal range of motion, good strength and no pain. *Id.* at 379:17-380:2; 384:16-20. Patients like Plaintiff can also continue to improve after they are released to work. *Id.* at 384:21-25.

24.    Dr. Heaton believed that there was at least a zero percent chance that Plaintiff would have a recurrent dislocation, stating that Plaintiff could have a zero to ten percent chance in his lifetime of a recurrent dislocation. *Id.* at 386:19-387:10. Plaintiff, in Dr. Heaton's view, had no significant risk of such, however. *Id.*

### D.    Testimony by Ms. Sharryn Jones Smith - Plaintiff's Physical Therapist

25.    Ms. Sharryn Jones Smith testified about her treatment of Plaintiff's shoulder. The Court finds her testimony credible. Further, the Court finds that the following testimony presented by or about Ms. Jones Smith is more probable than not under the preponderance standard.

26.    Plaintiff's physical therapist was Ms. Jones Smith who has 25 years of experience with a doctorate in physical therapy. *Id.* at 151:10-14. Ms. Jones Smith has treated hundreds of shoulder injuries and up to one hundred railroad employees. 158:6-12. Plaintiff initially presented wearing a sling and stating that he had difficulty using his right arm. *Id.* at 178:21-25.

27.    In physical therapy with Ms. Jones Smith, Plaintiff did exercises on pulley systems and eventually began using weights for strength training. Toward the end of his physical therapy, Plaintiff was doing pushups and pullups. By May or June, Plaintiff did not experience pain in his shoulder. *Id.* at 68:1-69:5. Plaintiff still felt strong and otherwise capable, with occasional stiffness. *Id.* at 68:6-11. Ms. Jones Smith included work-simulated exercises for Plaintiff based on his own description of his job duties. *Id.* at 159:3-11.

28.    Plaintiff's physical therapist also prescribed him a home exercise routine that included a weight program and stretching. He worked hard at the program and took it as a serious job because he wanted to get back to work at the railroad. *Id.* at 110:1-18. At one point while working on his ranch, Plaintiff felt or heard a pop in his shoulder. The popping sound was noted in his file, but there were no corresponding physical symptoms. *Id.* at 315:22-316:9.

29.    After several weeks of treatment, Ms. Jones Smith did not see any signs that Plaintiff was at risk for a re-dislocation of his shoulder. *Id.* at 161:1-20. Ms. Jones Smith believed Plaintiff would be physically able to do his job when she cleared him to return to work. *Id.* at 160:21-25. Though Plaintiff had difficulty raising his arm straight up, vertically by his ear, Plaintiff was able to do chest presses, a military press, floor pull-ups, pushups, skull crushers, and use the ab roller, which Ms. Jones Smith describes as a very high level of fitness. *Id.* at 200:14-25; 168:3-17.

30.    Plaintiff reported some persistent stiffness to his physical therapist's assistant, but also described that, after this level of training, Plaintiff's shoulder felt better than it had before his injury and stronger than it was before his accident. *Id.* at 202:7-11; 69:1-3. Plaintiff was a motivated and committed patient and Ms. Jones Smith considered him fully functional when he concluded therapy. *Id.* at 163:8-16.

### E.    *Plaintiff's Return-to-Work Efforts*

31.    Bridgette Ziemer is a fitness-for-duty nurse in the Health and Physical Services Department of Union Pacific. *Id.* at 395:6-17. The Court finds Ms. Ziemer to

be a credible witness. The following testimony by or about Ms. Ziemer is more probable than not under the preponderance standard.

32.    Ms. Ziemer's role involves working with Union Pacific employees for their return-to-work medical review as their point of contact to guide them through the process to return to work safely. *Id.* at 104:2-9; 401:12-15. Not everyone gets to return to work and that is a difficult aspect of the process for Ms. Ziemer.

33.    Ms. Zeimer advises employees what medical records they must provide to Union Pacific's physicians to review. The doctors involved in review of medical records submitted for the return-to-work review are Drs. John Holland and John Charbonneau. *Id.* at 402:1-23.

34.    After a Union Pacific employee requests off work for a medical condition, they must provide documentation to Ms. Ziemer showing they are cleared to return to work. *Id.* at 404:3-14.

35.    After Plaintiff was released for work by Dr. Heaton in April 2019, Plaintiff emailed Ms. Zeimer saying his doctor and physical therapist had cleared him for return to work and Plaintiff provided the corresponding medical records. *Id.* at 411:16-21. Ms. Zeimer continued to communicate with Plaintiff about further requests and follow up on his medical records. *Id.* at 414:1-4.

36.    In the meantime, while awaiting Union Pacific's clearance allowing him to return to work, Plaintiff continued to build the T-post fence line on his ranch, manually, using his own physical force. *Id.* at 60:1-14; 69:4-7. Plaintiff also climbed ladders around his ranch, baled hay, dug ditches, and trimmed trees. *Id.* at 69:16-25;

243:7-25. Plaintiff's full range of motion came back into his right arm. *Id.* at 80:13-20. His endurance of his right arm became better than his left. *Id.* By June, his range of motion on his right arm was only ten degrees less than his left arm, the unaffected arm. *Id.* at 354:2-12. The Court finds credible Plaintiff's testimony about his physical ability during the waiting period for returning to work.

37.     During this time, Union Pacific requested documentation from Plaintiff's physical therapist. The physical therapist sent a note recommending that Plaintiff "complete therapy, continue home exercise range of motion program. Feels he could return to work. Did caution him to avoid heavy lifting, pushing, pulling, or jerking motions. All of 4 to 6 weeks." Trial Ex. 3. Ms. Zeimer interpreted this as an incongruence conflicting with Dr. Heaton's release to work. *Id.* at 438:20:23.

38.     On May 20th, 2019, Plaintiff received a letter from Union Pacific representative Terry Brown. Trial Ex. 1; Trial Tr. 69:8-13. The letter stated Plaintiff was prohibited from climbing ladders and therefore could not return to his job. *Id.*

39.     Plaintiff was shocked to receive the letter because he had been climbing ladders for over a month before receiving the letter. Trial Tr. at 69:11-17. Plaintiff was surprised, overwhelmed, concerned, and angry about being prohibited from climbing ladders. He did not understand that conclusion, given that he had been engaging in strenuous activities around the ranch, including climbing ladders. He was upset that no one at Union Pacific had examined him to determine whether he was physically able to climb ladders or not. *Id.* at 70:1-18.

40.     Plaintiff had a call with Ms. Ziemer about his disappointment with the determination letter from Terry Brown and requested to speak with a Union Pacific physician to discuss the determination further. *Id.* at 424:9-18.

41.     In the meantime, Plaintiff found a job in construction five days after receiving the letter from Union Pacific. *Id.* at 72:2-3. Plaintiff called a friend who was a general contractor with two large projects going on. The friend offered Plaintiff a job as a supervisor at a multimillion-dollar construction site in Tulelake, California. *Id.* at 70:3-14. Plaintiff had never worked as a construction supervisor, but his friend hired Plaintiff based on Plaintiff's past leadership role in the military and his physical capability for the work. *Id.* at 70:14-25. At the construction job, Plaintiff swung hammers and carried cement and lumber. He worked on a three-story roof. *Id.* at 82:13-22.

42.     In May 2019, a few days after Plaintiff had been working at the construction site, he received notice of a decision from Associate Medical Director for Union Pacific, Dr. John Charbonneau, explaining to Plaintiff that Union Pacific determined he was medically qualified, but was subject to permanent restrictions, namely, that Plaintiff could not climb ladders or ride on the side of railcars. *Id.* at 72:5-19; Trial Ex. 21 at 10. Dr. Charbonneau had reviewed the release notes from Plaintiff's treating physician and physical therapist, and a few other supporting documents. *Id.* at 435:2-19.

43.     On a phone call with Ms. Ziemer and Dr. Charbonneau, Plaintiff explained that he did not believe the decision was fair, because he knew he could

perform the functions of his job with Union Pacific safely. If he felt he could not, he would not do the job. He would not put his family in jeopardy. He was working much harder at the construction site using his shoulder than he ever did at Union Pacific. *Id.* at 73:3-13; 424:4-13.

44.    Dr. Charbonneau's notes referenced what Plaintiff had told him about the work he was doing at the construction site. Plaintiff told Dr. Charbonneau that he was carrying ladders, climbing on ladders, and carrying 100-pound bags of cement and lumber. *Id.* at 73:14-74. Plaintiff would have submitted to Union Pacific for a functional capacity test or physical examination, but none was offered. *Id.* at 74:1-75:1. Dr. Charbonneau told Plaintiff that his main concern was about future instability of Plaintiff's shoulder. *Id.* at 101:7-8.

45.    At other times during the fitness-for-duty process, Plaintiff explained to Union Pacific that, even if he were to stand on a railcar, his common practice was to ride on the right side of the train facing the front of the train, with the left arm hooked through a rung, both feet planted, and his left and right hand free to talk on the radio or to us for signaling. *Id.* at 79:14-24. Trainmen, nevertheless, must be prepared to be on either side of the car. *Id.* at 473:17-24.

46.    Plaintiff learned that he could appeal Union Pacific's decision to prohibit his return to his job, and while he did so, he started looking for work because he had bills to pay. He was concerned that if he lost the income, he would lose the ranch, which was dear to him. *Id.* at 70:19-25.

47.     Plaintiff's construction job came to an end while he was awaiting his appeal determination from Union Pacific. He found work with the United States Postal Service, believing it to be temporary while he waited on Union Pacific's reconsideration. Plaintiff drove big, tall vans for which he would have to use railings to pull himself up to get into the back to access packages. *Id.* at 83:9-22.

48.     Ultimately, in October 2019, Dr. Holland upheld Dr. Charbonneau's determination to restrict Plaintiff from returning to his job as a trainman. *Id.* at 432:49.

**F.     Testimony of Dr. John Holland - Union Pacific's Fitness-for-Duty Policy and "1 Percent Rule"**

49.     Dr. John Holland testified on behalf of Union Pacific railroad about its fitness-for-duty policies. The Court finds Dr. Holland to be mostly credible. The Court finds the following testimony to be more probable than not, under the preponderance standard.

50.     At the time of the events giving rise to the case, Union Pacific had 45,000 employees, 40,000 of which were in safety-critical or safety-sensitive jobs, that is, jobs working in train yards, on construction crews, repairing bridges, and in other potentially hazardous roles. *Id.* at 454:22-455:3.

51.     Dr. Holland was chief medical director for Union Pacific at the time of the events giving rise to the case and is board certified in occupational medicine. *Id.* at 450:5-8; 453:4-5. Dr. Holland retired in 2019 after a long career in occupational and environmental medicine across many industries. *Id.* at 453:1-14. He developed the current fitness-for-duty policies at Union Pacific. Dr. Holland is now retired but

earns around $300,000 a year appearing as a litigation witness for Union Pacific. *Id.* at 510:1.

52.    The purpose of Union Pacific's fitness-for-duty program was to ensure that employees, when they came to work, they were physically and mentally fit to do their job duties safely and efficiently, and to ensure employees had no medical conditions that posed an underlying safety risk to themselves or others. *Id.* at 455:4-10. An example of a condition that posed a safety risk would be a heart condition where a person had a high risk of having an acute cardiac event. *Id.*

53.    Trainmen, conductors, and brakemen are safety-sensitive positions. *Id.* at 461:18-23. A person in Plaintiff's position, such as a trainman, conductor, or brakeman, would be required to stand on a ladder attached to the side of a train while the engineer is backing a train into place. The trainman would be the eyes and ears signaling or communicating by radio the directions to the engineer for the backup maneuver. *Id.* at 467:12.

54.    In occupational health, the concept of a safety-critical position is one where an employee is performing a task where the work location—such as on a moving train—or the job duties pose a significant and immediate risk if that employee were to lose consciousness, cognitive ability, or use of limbs. *Id.* at 455:19-456:5. Generally, the term for that sort of event is "sudden incapacitation." *Id.* at 456:15.

55.    Sudden incapacitation involves loss of consciousness or sudden or rapid impairment of mental or physical function that poses an immediate and serious risk to workers or others. *Id.* at 458:1-15.

56.    In 2016, Dr. Holland implemented a rule that if an employee has a 1 percent per year chance of sudden incapacitation, the employee cannot work in safety sensitive jobs. *Id.* at 350:18-351:7.

57.    Whether an employee has a 1 percent chance of sudden incapacitation is determined by reference to a listing of various conditions, such as stroke, seizures, heart attack, embolism, thrombosis, or diabetic coma. *Id.* at 351:4-7; 456:23-25. Dr. Holland also included in the policy anterior shoulder dislocation as a condition subject to a risk of greater than a 1 percent per year chance of sudden incapacitation. The policy at trial was coined "the 1 percent rule."

58.    Under the 1 percent rule, a Union Pacific employee with an anterior shoulder dislocation would be subject to permanent work restrictions from climbing on railcar ladders or working on ladders, holding onto ladders and standing on them during train movements, regardless of the extent of the injury. *Id.* at 478:15-19; 480:11-24; 501:24-502:5.

59.    Under the 1 percent rule, a permanent restriction for anyone having an anterior shoulder dislocation would be across the board on every employee in train service, regardless of any individual factor. *Id.* at 502:9-10.

60.    When Plaintiff first notified Union Pacific that he had dislocated his shoulder in January 2019, the 1 percent rule established, without regard to any other circumstances, that Plaintiff would not be allowed to go back to work in train service as a conductor without restrictions. *Id.* at 503:9-14.

61.    Union Pacific did not produce any company documents or internal memoranda that set forth in writing the 1 percent rule, and although it was well known to exist, no witness had any information about where the rule could be found in official Union Pacific policy.

62.    When Dr. Charbonneau initially reviewed the case, he was aware of the Union Pacific policy that places permanent restrictions on trainmen with anterior shoulder dislocations. Dr. Charbonneau placed permanent work restrictions on Plaintiff based on his understanding of the 1 percent rule application *Id.* at 481:9-16.

63.    When Plaintiff asked for reconsideration, Dr. Charbonneau had consulted Dr. Holland. *Id.* at 481:17-19.

64.    Dr. Holland then contacted Dr. Phillip Streubel, an orthopedic surgeon at the University of Nebraska Medical Center. *Id.* at 482:1-13. Union Pacific contracted with physicians at the University of Nebraska Medical Center to consult on fitness-for-duty cases. *Id.* The medical record Dr. Holland and Dr. Streubel reviewed did not include all of Plaintiff's medical history and treatment notes relating to his rehabilitation and Dr. Holland was not aware that he could have asked Plaintiff to sign a medical release form so Dr. Holland could obtain a more complete history. *Id.* at 511:13-25.

65.    When Dr. Holland consulted with Dr. Streubel, he conveyed that Plaintiff had been working hard on his ranch, lifting heavy bales of hay and sacks, and routinely climbing ladders at the construction site. *Id.* at 485:18-486:5. Dr. Holland asked Dr. Streubel to review the medical file and provide answers to three

questions. *Id.* at 486:13-24. Dr. Holland asked Dr. Streubel not to give an opinion about whether Plaintiff could perform specific job duties. *Id.*

66. The three questions Dr. Holland asked were (1) what is the appropriate diagnoses?; (2) Based on your review of the materials provided, evidence in the scientific literature, and your clinical judgment, is it probable that Plaintiff has an ongoing risk of greater than a 1 percent per year occurrence rate of future redislocation or instability of his right shoulder if he returns to work?; and (3) whether Plaintiff's shoulder required surgery. *Id.* at 488-490.

67. Dr. Holland asked for a written report from Dr. Streubel, but did not receive one. *Id.* at 490:19-23. However, Dr. Streubel did communicate by phone with Dr. Holland, after which Dr. Holland made his decision to continue the permanent restrictions initially issued by Dr. Charbonneau. *Id.* at 491:1-12.

68. In conjunction with his final decision, on October 10, 2019, Dr. Holland filled out a supplemental doctor's statement from a form that asked, "Do you believe that the patient is now able to work without restriction in his/her last occupation?" Dr. Holland checked "no." Trial Ex. 34.

69. The form further asks, "Give an estimated return-to-work date and explain how the medical evidence shows the patient is still disabled." *Id.*

70. Dr. Holland or his staff answered by estimating return to work by December 31, 2050. *Id.*

71. The distant nature of the date—2050—was intended to indicate that the restrictions were permanent. Trial Tr. at 522:5-6. Another statement on the form

proclaims that Plaintiff was "out due to medical. Permanent restrictions, not able to accommodate." Trial Ex. 34.

72.     On page 3 of the form, there is a certification featuring Dr. Holland's signature stating that Plaintiff "has been disabled from performing his. . . regular occupation . . . due to the following condition: Shoulder dislocation, permanent restrictions, not able to accommodate." *Id.*

73.     Though Dr. Holland had reviewed Dr. Heaton's notes saying that Plaintiff was strong, stable, had bilateral range of motion, was working construction, climbing ladders, and carrying lumber, Dr. Heaton's medical assessment did not change Dr. Holland's opinion.

74.     Dr. Holland was primarily influenced by the 1 percent policy, which dictated that, if an employee suffered an anterior shoulder dislocation, that employee could no longer be in train service, regardless of their individual capabilities. *Id.* at 526:1-15.

### G.     *Testimony of Dr. Phillipp Streubel*

75.     Dr. Phillipp Streubel testified about his consultation with Dr. Holland and his limited review of Plaintiff's medical records. Unless otherwise noted, the Court finds testimony of Dr. Streubel mostly credible. The Court finds the following facts to be more probable than not under the preponderance standard.

76.     The University of Nebraska contracts with the Health and Medical Services division of Union Pacific Railroad to provide case-specific consultation services for its medical review process. *Id.* at 541:23-542:9. Dr. Streubel is a physician

at the University of Nebraska whose duties to the University as faculty staff include the occasional consultation for Union Pacific. *Id.* at 543:7-9.

77.    Dr. Streubel could not remember whether he had provided a written report and no report could be located.

78.    When asked by Dr. Holland to diagnose Plaintiff's condition, Dr. Streubel recalls that he told Dr. Holland that Plaintiff had an anterior shoulder dislocation but could not conclude one way or the other whether Plaintiff had suffered a Bankart lesion because he did not have enough information to confirm or rule it out. *Id.* at 551:9-11.

79.    When asked by Dr. Holland whether he agreed that Plaintiff has an ongoing risk of greater than 1 percent per year occurrence rate of future dislocation, Dr. Streubel recalled that he told Dr. Holland that Plaintiff had between a 10 and 30 percent chance of redislocation. The Court finds that testimony not credible, considering the abundant and persuasive evidence in the record that Plaintiff's age was a factor that decreased the risk of redislocation and that Plaintiff had demonstrated great physical capacity to perform tasks required for the job, both factors of which Dr. Streubel was aware when he rendered his opinion. *Id.* at 554:11-20.

80.    When asked by Dr. Holland whether he agreed that surgical repair would reduce the risk of redislocation to less than 1 percent per year occurrence rate, Dr. Streubel recalls telling Dr. Holland that he agreed, it would not. *Id.* at 554:20-555:10.

81.    Dr. Streubel did not look at Plaintiff's x-rays before he concurred with Dr. Holland's opinion. *Id.* at 566:6-16. Rather, Dr. Streubel looked only at the risk of "somebody" redislocating their shoulder based on a pre-established threshold—the 1 percent threshold. *Id.*

### H.    Testimony of Dr. Kevin Trangle – Plaintiff's Expert Witness

82.    Dr. Kevin Trangle testified as an expert witness about fitness-for-duty policy considerations in various occupations and industries and about his opinion of Plaintiff's shoulder condition. The Court finds Dr. Trangle's testimony credible. The following evidence about and opinions by Dr. Kevin Trangle is more probable than not under the preponderance standard.

83.    Plaintiff retained Dr. Trangle as an expert to testify at trial. Dr. Trangle specializes in occupational and environmental medicine. *Id.* at 276:19-24. He is highly familiar with fitness-for-duty policies across a variety of industries including railroads.

84.    Dr. Trangle explained that, in general, when determining whether an employee is fit for duty, a decision maker should understand the nature and components of the job and assess the particular individual in light of their circumstances and medical facts. *Id.* at 296:2-22.

85.    Under the circumstances in this case, Dr. Trangle's assessment was that it was not medically professional to exclude a person from returning to their occupation on the basis of a shoulder dislocation alone without a more individualized evaluation of the employee's ability to perform the duties of the job. *Id.* at 297:1-4.

86.    Dr. Trangle reviewed Union Pacific's 1 percent rule and could not find a medical basis for it or determine the method by which it applies to a shoulder injury. There was nothing to be found in medical literature or standards that are published to suggest that the 1 percent rule was appropriate under the circumstances of this case or explain how it was calculated for Plaintiff. In Dr. Trangle's view, there was no scientific or medical basis for applying the 1 percent rule to terminate Plaintiff. *Id.* at 320:1-25; 333:4-19.

87.    Union Pacific highlighted Dr. Trangle's disclosed literature that showed that the *lifetime* prevalence of shoulder dislocation in the general population is 2% to 8%. *Id.* at 336:9-21.

88.    Dr. Trangle testified that Dr. Holland's 1 percent criteria was not uniform across the industry and that Dr. Holland was an outlier in his approach. *Id.* at 294:7-14.

89.    As to whether Dr. Streubel conducted a more individualized review of Plaintiff's ability to perform his job, Dr. Trangle pointed out that Dr. Streubel did not contact any of Plaintiff's treating doctors or therapists and he did not obtain Plaintiff's full medical record. No report from Dr. Streubel was available for examination at trial. *Id.* at 355:4-12.

90.    From that, Dr. Trangle gathered that Dr. Streubel did not have a complete picture of Plaintiff's shoulder injury or the status of Plaintiff's rehabilitation. Trial Tr. at 320. Union Pacific did not do any particular analysis of Plaintiff as a person. It did not have him physically examined. It did not seek to

discover how successful his rehabilitation had been. If it had concerns, Dr. Holland could have requested Plaintiff to provide evidence of an MRI to confirm whether Plaintiff had a Bankart lesion. It could have brought him to the train yard for a physical function test. It could have contacted any of his treating doctors. Union Pacific could have done those things before dismissing Plaintiff, but it did not. *Id.* at 322:6-24.

91.    Dr. Trangle agreed that Union Pacific has a duty to make sure it is safe for an employee to come back to work—safe for the employee and coworkers. But Dr. Trangle's opinion was that Union Pacific should have taken a harder look at Plaintiff as an individual, rather than strictly apply the 1 percent policy to dismiss him. *Id.* at 323:1-5.

92.    According to the literature, a simple anterior shoulder dislocation in a man of Plaintiff's age, who has no other medical complications, has a lower risk of recurrent dislocation than a younger person, and in many cases, has less risk than the general population for a recurrent dislocation in the future. *Id.* at 299:1-6.

93.    In Dr. Trangle's opinion, that was especially true considering the rehabilitation and physical therapy Plaintiff undertook. *Id.* at 300:11-19.

94.    The age of the person is a major factor in determining whether a person is at risk for re-dislocation. In Plaintiff's case, his age was a positive factor because the older a person is, the less risk there is of having a recurrent dislocation. *Id.* at 298:16-23.

95.    Dr. Trangle agreed with Dr. Heaton, Plaintiff's treating physician, that there was likely to be no pathological indication of injury, beyond stretching, to Plaintiff's rotator cuff. *Id.* at 314:10-315:3; 330:3-19. From Dr. Trangle's conversations with him, Dr. Heaton believed there was no clinical justification to perform an MRI on Plaintiff's shoulder. *Id.* at 330:20-331:3.

96.    Based on Dr. Trangle's testimony, it was not a best practice for Union Pacific to use a uniform, blanket policy to screen out from working as a trainman all employees who had ever had an anterior shoulder dislocation. *Id.* at 301:23-302:2.

97.    The more reliable fitness-for-duty practice would be for Union Pacific to consider the medical facts about shoulder dislocations, the amount of rehabilitation Plaintiff had completed, and Plaintiff's physical success with the rehab. *Id.* at 302:5-14. Additionally, Union Pacific could have performed a functional capacity evaluation, upon which it would have seen that Plaintiff was very fit and able to perform the physical duties of his job. *Id.* at 302:21-25.

98.    Dr. Trangle called Dr. Heaton, Plaintiff's treating physician, and discussed with Dr. Heaton Plaintiff's medical file and physical therapy notes. Dr. Trangle inquired about Plaintiff's response to therapy, tightness in the shoulder, and Plaintiff's range of motion. *Id.* at 316:23-317:7. Dr. Trangle agreed with Dr. Heaton's opinion that Plaintiff was not at any greater or significant risk of dislocation than the general public in his age group. *Id.* at 311:9-13.

99.    Reviewing demonstrative photographs at trial of people engaging in the physical movements one might expect of a trainman working on locomotion, Dr.

Trangle opined that Plaintiff would have no trouble performing the physical functions required to do those jobs, and to do them without risk of shoulder dislocation. *Id*. at 311:15-313:25. Functions included hanging on the side of a train car. *Id*. at 312:16-25.

100.    It was Dr. Trangle's opinion that before terminating Plaintiff from his job, Dr. Holland should also have called Dr. Heaton as part of the evaluative process. *Id*. at 317:2-8. Dr. Holland would not have had to take Dr. Heaton's advice, but a good practice as the medical director for Union Pacific should include talking to treating physician to obtain their perspective. *Id*. at 317:10-22.

### I.    Noneconomic Damages

101.    While awaiting his appeal determination, Plaintiff's route to his construction job took him over the railroad tracks. Crossing them twice daily, he missed his job and could not understand why he was not allowed to work there. *Id*. at 84:10-22. Other times, Plaintiff could tell by the cadence of the train horn blowing who the engineer was. He always stopped to listen. When Plaintiff worked as a mail carrier, he delivered mail to the Union Pacific building. Plaintiff described that walking into the building after his termination felt like a kick in the nuts every day. To Plaintiff it was humiliating. *Id*. at 85:14-22.

102.    Since losing his job, Plaintiff has not had the income necessary to pay for the costs to sustain his ranch. For example, he was not able to pay for replanting his fields. *Id*. at 62:1-10. Plaintiff was not able to build a pole barn to store hay,

complete the chicken coop, and pay to relocate a water pump. *Id.* at 62:10-63:11. This caused Plaintiff much distress.

103.    Plaintiff lost sleep from worry because his termination left him in a different position financially. He and his wife have had to redo their budget multiple times. Plaintiff cashed out his 401k to keep the ranch afloat. To his wife, he appeared transformed to appear downcast with his head hung and was frustrated, upset, sleepless, and withdrawn. *Id.* at 228:10-229:6; 237:19-25. The Court finds Jennifer Granas' testimony about Plaintiff's emotional and psychological affect to be credible.

### J.    Economic Damages

104.    Forensic economist James Mills testified about Plaintiff's past, present and future economic loss, including past and future lost wages and fringe benefits, calculated at present cash value, and based on Plaintiff's income and tax records, records from the Railroad Retirement Board, and documents produced by Union Pacific Railroad Company in discovery. The Court finds Mr. Mills' testimony to be more probable than not under the preponderance standard.

105.    Mr. Mills explained that according to the Railroad Retirement Board, Plaintiff would not be eligible for an unreduced pension until he had reached age 67 in the year 2031. *Id.* at 262:1-11. Retirement before then would have led to a reduced pension. *Id.* at 272:22-25. Therefore, Mr. Mills calculated future earnings through the year 2031, the year Plaintiff would reach the age of 67.

106.    Because Mr. Mills did not review deposition testimony or other records beyond financial records, he was not made aware that Plaintiff had told Union Pacific

back in 2019 that he planned on working four and a half more years, not twelve more years. *Id.* at 271:6-11.

107.   Mr. Mills stated that, as far as he was aware, he based his analysis on a person like Plaintiff who had been working since high school graduation without stopping and who, up until trial, was continuing to do so at the age of 61. *Id.* at 274:3-12.

108.   Plaintiff explained that it had been his intention not to retire until after he turned 67. *Id.* at 668:1-3. He recalled the conversation with Union Pacific in 2019 when Plaintiff conveyed that he would not reach his 20-year-mark with Union Pacific until he was 60, and that was four and a half years away. *Id.* at 668:12-21

109.   It is more probable than not, given the evidence of need for income for the ranch and Plaintiff's overall health, strength, and energy, that Plaintiff would have retired at the age of 67 when his pension would fully vest. In Mr. Mills view, when it comes to standards set by data, there are people who work less and people who work longer than what is standard. For Plaintiff, Mr. Mills measured a person of 55 years who had fifteen years of service before he was injured and found that the average plus the standard deviation would entail 14 more years of service. Mr. Mills' individualized analysis landed him at the 12-year mark where Plaintiff would likely retire once he was eligible for 100 percent of his pension. *Id.* at 274:1-19.

110.   Based on best available data, Mr. Mills calculated the present cash value of Plaintiff's economic loss using generally accepted statistical techniques and econometric methods of analysis. Mr. Mills' calculations of the present value of

Plaintiff's economic damages encompassed the period from 2019 to the end of Plaintiff's work life-expectancy in 2031 and he reduced that figure to present value using U.S. Treasury yields for each respective year in the future.

111.    After subtracting Plaintiff's mitigating income earned and projected to earn at other jobs, Mr. Mills calculated Plaintiff's total economic net loss for past, present, and future earnings to be $952,863. *Id.* at 265:15-16.

112.    Of that $952,863, Mr. Mills explained that a portion was for past loss to present, and the other portion was for future loss to 2031. Specifically, of the total amount, Mr. Mills calculated Plaintiff's past loss or back pay to be $443,014.00. *Id.* at 265:17-266:1.

113.    Plaintiff's future loss or front pay was calculated to be $509,849, together making up the total $952,863. *Id.* at 266:4-10.

### K.    *Punitive Damages*

114.    Union Pacific is a large company with a stock valuation of roughly $131 billion. It is listed on the Dow Jones Industrial and the S&P 500 stock market indices. *Id.* at 662:6-7. In 2024, Union Pacific had revenue of $24.3 billion and net income of $6.7 billion. *Id.* at 662:9-11. That is $18.5 million dollars a day in profit. *Id.* at 663:11.

115.    Defendant is a sophisticated company that is aware of unlawful employment practices under the ADA. *Id.* at 524:5-20; Trial Exs. 34, 52.

## LEGAL CONCLUSIONS

### A.    *Disability Discrimination under State and Federal Law*

1.      Disability discrimination claims under ORS. § 659A.112 are functionally equivalent to ADA claims, and both claims may be assessed together. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001).

2.      To state a claim for disability discrimination, a plaintiff must allege that they are (1) disabled within the meaning of the statute; (2) a qualified individual able to perform the essential functions of the job; and that they (3) suffered an adverse employment action because of their disability. *Rood v. Umatilla Cnty.*, 526 F. Supp. 2d 1164, 1174 (D. Or. 2007) (citations omitted).

3.      Plaintiff established by a preponderance of the evidence that he is disabled under state and federal law.

4.      Plaintiff established by a preponderance of the evidence that he was a qualified individual able to perform the essential functions of the job as a trainman at Union Pacific.

5.      Plaintiff established by a preponderance of the evidence that he suffered an adverse employment action because of his disability when Union Pacific placed him under permanent restrictions and refused to allow him to return to his job.

### B.    *Overview of Damages Under the ADA*

6.      The ADA expressly incorporates the remedies available under Title VII of the Civil Rights Act of 1964. *Lutz v. Glendale Union High Sch.*, 403 F.3d 1061, 1067 (9th Cir. 2005). Compensatory and punitive damages are available in claims under Title VII, 42 U.S.C. § 2000e *et seq.*, and the ADA, 42 U.S.C. § 12101 *et seq.* Compensatory damages "do not include backpay, interest on backpay, or any other

type of relief authorized under section 706(g) of the Civil Rights Act." 42 U.S.C. § 1981a(b)(2). Compensatory damages may include "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." *Id.*

7.    The amount of punitive damages and compensatory damages awarded under § 1981a may not exceed the statutory cap set forth in § 1981a(b)(3).

8.    The statutory cap is based on the number of people employed by the defendant. In this case, the cap is $300,000 because Defendant has more than 500 employees.

### C.    *Back Pay and Front Pay Under the ADA*

9.    Congress provided that the compensatory and punitive damages remedy it created were "in addition to any relief" authorized under prior law. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 253 (1994).

10.    The Ninth Circuit has held that, under prior law, back pay is an equitable remedy, and the court, not a jury, has ultimate discretion regarding the amount of the award. *Lutz v. Glendale Union High School*, 403 F.3d 1061, 1069 (9th Cir. 2005). Accordingly, back pay is not subject to the damages cap in § 1981a(b)(3).

11.    Similarly, front pay is a remedy previously authorized under the Civil Rights Act. Congress did not limit the availability of such awards in § 1981a(b)(3). Instead, Congress sought to expand the available remedies by permitting the recovery of compensatory and punitive damages in addition to previously available

remedies, such as front pay. *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 854 (2001).

12.     Despite the term "future pecuniary losses" in the statute, the Supreme Court has held that front pay is not an element of compensatory damages within the meaning of § 1981a(b)(3). *Id.* at 848. The Court explained front pay is a remedy authorized under prior law, and the statutory cap in § 1981a(b)(3) is therefore inapplicable to front pay. *Id.*

13.     To summarize, the statutory cap under § 1981a(b)(3) applies to punitive damages and compensatory damages, such as emotional harm and other pecuniary losses, but not back pay or front pay, as awarded by the jury in this case.

14.     Noted at the beginning of this opinion, the jury's back pay award is advisory in this case under Fed. R. Civ. P. 39(c)(1). The jury's front pay award is not advisory.

15.     The evidence established that Plaintiff is entitled to $952,863 of combined back and front pay. *Id.* at 265:15-16. That total includes $443,014 in back pay and $509,849 in front pay.

16.     It is abundantly clear that the jury mistakenly switched those figures when it awarded $509,849 in back pay and $443,014 in front pay. *See* JVF (question 7).

17.     Back pay remains an equitable remedy to be awarded by the district court in its discretion. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 415-16 (1975). The Court finds the jury's award on the whole—$952,863—is supported by a

preponderance of the evidence in the record, and satisfies the ADA's equitable purpose of back pay, which is to make the plaintiff whole. *Loeffler v. Frank*, 486 U.S. 549, 558 (1988) (An award of back pay is appropriate to advance "Congress' intent to make 'persons whole for injuries suffered through past discrimination.'"). To depart from the jury's intent, evinced by its implicit findings, would be to impermissibly disregard those findings. *Teutscher v. Woodson*, 835 F.3d 936, 944 (9th Cir. 2016).

18.    Therefore, the Court's equitable analysis is conducted in conjunction with its finding that the jury's award was supported by sufficient evidence. Based upon the jury's verdict in Plaintiff's favor and the supporting evidence presented at trial, the Court finds no reason to depart from the jury's award of $509,849 in back pay, the amount necessary to make Plaintiff whole.

### D.    *Punitive Damages under the ADA*

19.    To recover punitive damages under the ADA, a plaintiff must show that the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to [her] federally protected rights." 42 U.S.C. § 1981(b)(1); *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 534 (1999). To meet this standard, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." *Kolstad*, 527 U.S. at 536.

20.    Although egregious conduct may be evidence of intent to break the law, such conduct is not required to establish punitive damages. *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 515 (9th. Cir. 2000). "[I]n general, intentional discrimination is enough to establish punitive damages liability." *Id*.

21.     The unanimous jury determined by the preponderance of the evidence that Union Pacific intentionally discriminated against Plaintiff based on a disability and that it did so with clear knowledge that its conduct would likely violate the ADA.

22.     Like the jury in this case, the Court also concludes that evidence at trial demonstrates, by a preponderance of the evidence, that Union Pacific discriminated against Plaintiff when it terminated him from employment based on his disability, namely, his anterior shoulder dislocation.

23.     The unanimous jury also determined, by the preponderance of the evidence, that Union Pacific's 1 percent policy was an unlawful screening policy that tends to screen out individuals with disabilities, including Plaintiff's disability.

24.     So too, by a preponderance of the evidence, the Court determines that Union Pacific's 1 percent policy was unlawful and that it screens out or tends to screen out individuals with disabilities, such as Plaintiff, and that Union Pacific excluded Plaintiff from returning to his job because of his anterior shoulder dislocation, regardless of Plaintiff's individual condition. *See e.g.* Trial Tr. 501:12-502:11.

25.     Evidence at trial established that Union Pacific's "1 percent rule" listed injuries it had predetermined to have a 1 percent chance or greater of sudden incapacitation, and if an employee sustained such an injury, Union Pacific restricted the employee from returning to their job. *See* Trial Tr. 479:15-21; 501:08-502:11.

26.     Plaintiff's shoulder injury was one of the "1 percent rule" injuries which would result in imposition of permanent restrictions.

27.     Evidence at trial established that Plaintiff operated a ranch and worked construction, frequently carrying 120-pound hay bales, climbing ladders, and holding 100-pound sacks. It was more likely than not that Union Pacific had read Plaintiff's personal medical records and statements from Plaintiff's physicians that he was physically fit and strong post-injury, and could perform all the functions required for his job, yet refused to allow Plaintiff to return to work based on its 1 percent policy. Trial Tr. 321:16-322:24; 525:25-526:21.

28.     Evidence at trial established that Union Pacific did not evaluate Plaintiff individually, even though it could have. Trial Tr. 512:5-18.

29.     Union Pacific categorized Plaintiff's shoulder injury as a disability on its official forms and trial exhibits showed that Union Pacific was a sophisticated company, aware of unlawful employment practices under the ADA. Trial Tr. 524:5-20; Trial Exs. 34, 52.

30.     There was abundant evidence at trial from which the Court now concludes that it is more likely than not that Union Pacific was aware of anti-discrimination principles and that its policy was facially discriminatory; that Union Pacific directed the policy at employees with a certain medical diagnosis; and that Union Pacific used the policy to restrict those employees from work or returning to work.

31.     Courts have routinely held that "punitive damages are appropriate under *Kolstad* where the plaintiff demonstrated that the defendants were aware of anti-discrimination principles." *Hemmings v. Tidyman's Inc.*¸ 285 F.3d 1174, 1198-99

(9th Cir. 2002). In general, intentional discrimination is enough to establish punitive damages liability, even in the absence of egregious conduct. *Passantino*, 212 F.3d at 515.

32.    There is substantial evidence in the record to support a finding that Union Pacific had sufficient malice, or a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others supporting an award of punitive damages.

33.    Evidence at trial established that Union Pacific earned $18.5 million each day in profit.

34.    The Court determines that an attentive jury, carefully instructed on the law, found that Plaintiff should be awarded more than one-day's profit for Union Pacific, in order for the award to serve the broader functions of "deterrence and retribution." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003)

35.    Accordingly, the Court adopts the jury's advisory verdict on punitive damages of $25 million dollars.

**E.        *Damages Under Oregon Law***

36.    Claims brought under the Oregon law are "construed to the extent possible in a manner that is consistent with . . . similar provisions of the [ADA]." ORS 659A.139.

37.    Under Oregon law, ORS § 659A.885(3) allows courts to award both compensatory and punitive damages for claims brought under a list of enumerated statues, including ORS § 659A.112, Oregon's disability discrimination law.[1]

38.    Oregon law permits a court to award any amount in punitive damages. ORS § 659A.885(3)(a).

39.    The Court views evidence at trial, and the reasonable inferences to be drawn therefrom, in the light most favorable to Plaintiff, the party in whose favor the jury returned the verdict. *Northwest Natural Gas Co. v. Chase Gardens, Inc.,* 328 Or. 487, 490 (1999).

40.    Punitive damages are appropriate where the defendant acted with malice or "a reckless and outrageous indifference to a highly unreasonable risk of harm and . . . with a conscious indifference to the health, safety and welfare of others." ORS § 31.730(1). "Malice, in the context of punitive damages in civil cases, is 'the intentional doing of [an] injurious act without justification or excuse.'" *Howard v. Waremart, Inc.,* 147 Or. App. 135, 140 (1997) (quoting *Friendship Auto Sales Inc., v. Bank of Willamette Valley*, 300 Or. 522, 535 (1986).

41.    Oregon law recognizes that punitive damages may be awarded to deter a large organization or enterprise from future misconduct, even where the misconduct at issue is "wholly impersonal with respect to any victim." *Jane Doe 130 v. Archdiocese of Portland in Or.*, 717 F. Supp. 2d 1120, 1140-41 (D. Or. 2010) (quoting *Andor v. United Air Lines, Inc.*, 303 Or. 505, 514 (1987)). But "[t]he Due Process

---

[1]    Union Pacific argues for the first time that Oregon's punitive damages statute is unconstitutional. The Court does not reach that argument.

Clause of the Fourteenth Amendment prohibits a State from imposing a 'grossly excessive' punishment on a tortfeasor." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996).

42.    An award that the Court can characterize as "grossly excessive" in relation to the state's interests is one that is arbitrary and, therefore, violates due process. *Parrott v. Carr Chevrolet, Inc.*, 331 Or. 537, 549 (2001) (quoting *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 456 (1993)).

43.    Courts must consider three guideposts when determining whether punitive damages are grossly excessive, including "(1) the degree of reprehensibility of the defendant's misconduct, (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages ... and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto Ins. v. Campbell*, 538 U.S. 408, 418 (2003).

44.    As to the "degree of reprehensibility" evidence at trial showed that Union Pacific was reckless and outrageous in its indifference when it ignored Plaintiff's medical documentation, his own representation about his individual abilities and physical capacity to perform the duties of his job, and his treater's recommendations. Testimony at trial established that Union Pacific would refuse to allow Plaintiff to return to work, no matter what, based on its policy excluding anyone from safety-sensitive jobs who had sustained a shoulder dislocation.

45.     As for the disparity between the actual harm and the award is not great, considering Plaintiff lost out on a livelihood he enjoyed and one not easily replaceable in the Klamath Falls community.

46.     With respect to punitive damages in comparable cases, the Court concludes that this case is not remarkable. *See* Plf. Reply, ECF No. 120 at 2 (compiling cases).

47.     Further, punitive damages may properly be imposed to advance a state's "legitimate interests in punishing unlawful conduct" and "deterring its repetition." *Axen v. Am. Home Prods. Corp. ex rel. Wyeth-Ayerst Lab'ys*, 158 Or. App. 292, 318 241 (1999);[2] (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568 (1996).

48.     The state of Oregon has a legitimate interest in punishing discriminatory conduct and deterring its repetition in this case. The Court cannot characterize the jury's advisory award of $25 million as "grossly excessive," given Union Pacific's daily profit and the state's interest in deterring discrimination. A lesser award would not have the effect clearly intended by the jury to discourage further conduct by Union Pacific. The amount is not arbitrary, but clearly and convincingly supported by evidence at trial, and does not violate due process.

49.     Union Pacific presented no evidence at trial or in its supplemental briefing that it has any intention of amending its 1 percent policy. Testimony of Dr. Holland that Union Pacific was looking out for Plaintiff's safety by refusing to allow

---

[2]     *Opinion adhered to as modified on reconsideration sub nom. Axen v. Am. Home Prods. Corp.*, 160 Or. App. 19 (1999).

him to return to work was not credible. Plaintiff's evidence that Union Pacific's intention was to enforce its policy, rather than make an individualized safety determination about him, was more probable than not. Union Pacific's imposition of permanent restrictions on Plaintiff constitutes an intentional doing of an injurious act without justification, sufficient to support an award for punitive damages.

### F.     *Total Allocation of Damages*

50.     As the Court stated above, 42 U.S.C. § 1981a(b)(3)(D) limits compensatory and punitive damages to $300,000, combined. The jury awarded $1,000,000 in compensatory damages and $25,000,000 in punitive damages. The total clearly exceeds the $300,000 cap.

51.     But, as the verdict form indicates, the jury found for Plaintiff on *both* federal and state law discrimination claims and awarded damages without specifying the allocation between the claims. The most reasonable assumption is that the jury awarded the same damages on both the federal and state claims. *Passantino*, 212 F.3d at 509. Awarding $26 million on both the federal claims and $26 million on the state claim would be duplicative, however. *Id.*

52.     In the absence of a statutory mandate to allocate damages to one claim rather than another, the Court has authority to allocate the damages to either claim. *Id.* (citing *Martini v. Federal National Mortgage Association,* 178 F.3d 1336, 1349-50 (D.C. Cir. 1999) (treating damage award as interchangeable under local and federal law where standards of liability are identical).

53.    In the context of Title VII, The Ninth Circuit has held that compensatory damages allocated by the court to claims other than the federal claims should not be subject to the federal cap. *Id.; Pavon v. Swift Transportation Co.,* 192 F.3d 902, 910-11 (9th Cir.1999). The Court finds that holding applicable here. To diminish the jury's non-advisory compensatory award of $1,000,000 so substantially would partially nullify the jury's state law determination, by effectively subjecting the entire compensatory award to the federal cap. The Court declines to incur that result.

54.    Accordingly, the Court allocates damages as follows:

  a.    $300,000 of the jury's advisory punitive damages award is allocated to Plaintiff's federal claims under the ADA, the maximum allowed under § 1981a(b)(3).

  b.    The remaining $24,700,000 of the jury's advisory punitive damages award is allocated to Plaintiff's claim under Oregon law.

  c.    $952,863 in economic damages, including front and back pay, is allocated to Plaintiff's federal discrimination claims and is not subject to the statutory cap under § 1981a(b)(3).

  d.    $1,000,000 of the jury's compensatory damages award is allocated to Plaintiff's state law claim.

  e.    Plaintiff's total award is $26,952,863

## CONCLUSION

In light of the foregoing evidence and the jury's advisory verdict on back pay and punitive damages, the Court finds that Plaintiff shall be awarded $509,849 in

back pay and $25,000,000 in punitive damages, allocated in conformity with this opinion. Judgment shall be entered accordingly.

IT IS SO ORDERED.

Dated this 18th day of August, 2025.


_____/s/Ann Aiken_____

Ann Aiken

United States Senior District Judge