Thomas M. Christ, OSB No. 834064
Sussman Shank LLP
1000 S.W. Broadway, Suite 1400
Portland, OR 97205
(503) 227-1111
tchrist@sussmanshank.com

William H. Walsh, OSB No. 106774
Cozen O'Connor
999 Third Ave., Ste. 1900
Seattle, Washington 98104
(206) 340-1000
wwalsh@cozen.com

Christopher S. Hennessy (admitted *Pro Hac Vice*)
Cozen O'Connor
123 N. Wacker Dr., Suite 1800
Chicago, IL 60606
(312) 474-7900
chennessy@cozen.com

*Counsel for Defendant Union Pacific*
*Railroad Company*

## UNITED STATES DISTRICT COURT
### DISTRICT OF OREGON
### MEDFORD DIVISION

| | |
|---|---|
| MARK GRANAS, | Case No. 1:21-cv-00116-AA |
| Plaintiff, | |
| v. | **DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL** |
| UNION PACIFIC RAILROAD COMPANY, | |
| Defendant. | **ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

LEGAL STANDARD............................................................................................................2

ARGUMENT .........................................................................................................................3

I.      Defendant Is Entitled To Judgment As A Matter Of Law. ...............................3

        A.     Plaintiff Failed To Prove That He Was A Qualified Individual. ............... 3

        B.     Plaintiff's Claims Fail Because He Posed a "Direct Threat" to Himself and Others. ..................................................................................... 6

        C.     Plaintiff's Unlawful-Screening Claim Fails Because The Screening Criteria Were Necessary And Related To His Job..................................... 9

II.     The Court Should Grant Defendant Judgment As A Matter Of Law On Punitive Damages, Or At Least Reduce The Award. ...........................................10

        A.     The Evidence Is Insufficient To Support Punitive Damages Under Federal Or State Law. ................................................................................ 10

            1.     Federal Law. ................................................................................. 10

            2.     State Law. ..................................................................................... 13

        B.     The Punitive Damages Award Is Excessive Under The Due Process Clause. ........................................................................................ 15

III.    The Damage Award Should Not Be Allocated Almost Entirely To The State Law Claim............................................................................................................19

CONCLUSION......................................................................................................................21

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Albertson's, Inc. v. Kirkingburg*,
   527 U.S. 555 (1999)....................................................................................................9

*Aly v. Mohegan Council, Boy Scouts of Am.*,
   871 F. Supp. 2d 19 (D. Mass. 2012) ......................................................................12

*Arizona v. ASARCO LLC*,
   773 F.3d 1050 (9th Cir. 2014) ...............................................................................18

*Austin v. Wal-Mart Stores, Inc.*,
   2008 WL 4936480 (D. Or. Nov. 14, 2008)...........................................................14

*Bains v. Arco Prods. Co., Div. of Atl. Richfield Co.*,
   405 F.3d 764 (9th Cir. 2005) ...........................................................................16, 18

*Bates v. United Parcel Serv., Inc.*,
   511 F.3d 974 (9th Cir. 2007) ...........................................................................3, 4, 9

*Bingham v. Union Pac. R.R. Co.*,
   693 F. Supp. 3d 1033 (D. Neb. 2023)....................................................................11

*BladeRoom Group Ltd. v. Emerson Elec. Co.*,
   20 F.4th 1231 (9th Cir. 2021) .........................................................................20, 21

*BMW of N. Am., Inc. v. Gore*,
   517 U.S. 559 (1996)...........................................................................15, 16, 18, 19

*Carlton v. Union Pac. R.R. Co.*,
   2023 WL 6388021 (D. Neb. Sept. 29, 2023)...................................................13, 16

*Chevron USA, Inc. v. Echazabal*,
   536 U.S. 73 (2002)...................................................................................................7

*Christensen v. Union Pac. R.R. Co.*,
   2025 WL 1682676 (D. Neb. May 23, 2025)..............................................8, 13, 17

*Clark v. Chrysler Corp.*,
   436 F.3d 594 (6th Cir. 2006) .................................................................................16

*Cripe v. City of San Jose*,
   261 F.3d 877 (9th Cir. 2001) .............................................................................9, 10

*Dawe v. Corrections USA*,
   506 F. App'x 657 (9th Cir. 2013) ..........................................................................18

# TABLE OF AUTHORITIES

*(continued)*

Page(s)

*Friendship Auto Sales, Inc. v. Bank of Willamette Valley*,
716 P.2d 715 (Or. 1986) ...................................................................................13

*Gibson v. Moskowitz*,
523 F.3d 657 (6th Cir. 2008) .......................................................................20, 21

*Hamlin v. Hampton Lumber Mills, Inc.*,
193 P.3d 46 (Or. Ct. App. 2008)........................................................................14

*Hamlin v. Hampton Lumber Mills, Inc.*,
246 P.3d 1121 (Or. 2011) ..................................................................................19

*Harriss v. Pan Am. World Airways, Inc.*,
649 F.2d 670 (9th Cir. 1980) .............................................................................10

*Helm v. Country Couch, Inc.*,
2007 WL 1695155 (D. Or. June 7, 2007) ..........................................................12

*Hounshel v. Battelle Energy Alliance, LLC*,
2014 WL 3408559 (D. Idaho July 10, 2014) .....................................................12

*Hutton v. Elf Atochem North America, Inc.*,
273 F.3d 884 (9th Cir. 2001) ...............................................................................7

*Jang v. Bos. Sci. Corp.*,
2015 WL 13672836 (C.D. Cal. July 6, 2015).......................................................3

*Kees v. Wallenstein*,
161 F.3d 1196 (9th Cir. 1998) ..............................................................................6

*Kirbyson v. Tesoro Refining & Marketing Co.*,
795 F. Supp. 2d 930 (N.D. Cal. 2011) ...............................................................13

*Kolstad v. Am. Dental Ass'n*,
527 U.S. 526 (1999)...............................................................................11, 12, 13

*Krehbiel v. Union Pac. R.R. Co.*,
2020 WL 5503363 (D. Kan. Sept. 11, 2020)........................................................8

*Laymon v. Lobby House, Inc.*,
613 F. Supp. 2d 504 (D. Del. 2009)...................................................................17

*Leavey v. Unum Provident Corp.*,
295 F. App'x 255 (9th Cir. 2008) ......................................................................16

# TABLE OF AUTHORITIES

*(continued)*

Page(s)

*Marsh Aviation Co. v. Hardy Aviation Ins. Inc.*,
    720 F. App'x 418 (9th Cir. 2018) ................................................................3

*Michael v. City of Troy Police Dep't*,
    808 F.3d 304 (6th Cir. 2015) ....................................................................12

*Milan v. Union Pacific Railroad Co.*,
    2019 WL 2030553 (D. Or. Apr. 19, 2019)) ...............................7, 8, 13, 16

*Minden v. Allstate Property & Casualty Ins. Co.*,
    2025 WL 2528624 (D. Nev. Sept. 3, 2025) ...........................................16

*Molski v. M.J. Cable, Inc.*,
    481 F.3d 724 (9th Cir. 2007) ....................................................................3

*Morse v. S. Union Co.*,
    174 F.3d 917 (8th Cir. 1999) ..................................................................17

*Nunes v. Wal-Mart Stores, Inc.*,
    164 F.3d 1243 (9th Cir. 1999) .............................................................3, 7

*Pac. Mut. Life Ins. Co. v. Haslip*,
    499 U.S. 1 (1991) ....................................................................................17

*Parker v. Crete Carrier Corp.*,
    158 F. Supp. 3d 813 (D. Neb. 2016) .....................................................9, 10

*Passantino v. Johnson & Johnson Consumer Prods., Inc.*,
    212 F.3d 493 (9th Cir. 2000) ..................................................................20

*Pavao v. Pagay*,
    307 F.3d 915 (9th Cir. 2002) ....................................................................2

*Quinby v. WestLB AG*,
    2008 WL 3826695 (S.D.N.Y. Aug. 15, 2008) ......................................17

*Schwarz v. Philip Morris USA, Inc.*,
    355 P.3d 931 (Or. Ct. App. 2015) ..........................................................14

*Seals v. Union Pac. R.R. Co.*,
    2025 WL 2061528 (D. Neb. July 23, 2025) .......................................8, 13, 16

*Sing v. Hawaiian Airlines, Inc.*,
    2021 WL 5310896 (D. Haw. Nov. 15, 2021) .........................................12

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

*Snead v. Metro. Prop. & Cas. Ins. Co.*,
   237 F.3d 1080 (9th Cir. 2001) ..................................................................3, 4

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
   538 U.S. 408 (2003).................................................................15, 16, 17, 18, 19

*Tomao v. Abbott Lab'ys, Inc.*,
   2007 WL 2225905 (N.D. Ill. July 31, 2007)........................................17

*United Nat'l Maint., Inc. v. San Diego Convention Ctr. Corp., Inc.*,
   2012 WL 12845620 (S.D. Cal. Sept. 5, 2012)..........................................3

## Constitutional Provisions

U.S. Const. amend. V ..........................................................................15

U.S. Const. amend. XIV ......................................................................15

## Statutes

42 U.S.C. § 1981a .............................................................................17

42 U.S.C. § 1981a(a)(2).....................................................................2, 10

42 U.S.C. § 1981a(b) .........................................................................21

42 U.S.C. § 1981a(b)(1)..................................................................2, 10, 14

42 U.S.C. § 1981a(b)(3)(D) ...............................................................19

42 U.S.C. § 12111(3) ..........................................................................6

42 U.S.C. § 12111(8) ..........................................................................4

42 U.S.C. § 12112(b)(6) ......................................................................4

42 U.S.C. § 12113(a) ...........................................................................9

42 U.S.C. § 12113(b) ........................................................................6, 9

O.R.S. § 31.730 ...............................................................................14

O.R.S. § 31.730(1) ........................................................................2, 13, 14

O.R.S. § 659A.112 ...............................................................................3

O.R.S. § 659A.139(1) ...........................................................................3

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

**Rules**

Fed. R. Civ. P. 50(b) ...................................................................................1, 2, 21

Fed. R. Civ. P. 59 ...............................................................................................21

Fed. R. Civ. P. 59(a) ........................................................................................1, 3

Fed. R. Civ. P. 59(e) ........................................................................................1, 3

**Regulations**

28 C.F.R. § 36.504(a)(3) .....................................................................................19

29 C.F.R. § 1630.2(m) .....................................................................................4, 5

29 C.F.R. § 1630.2(n)(1) .......................................................................................4

29 C.F.R. § 1630.2(r) .............................................................................................7

Or. Admin. R. 839-006-0244(1) ...........................................................................6

## LR 7-1 CERTIFICATION

Pursuant to Local Rule 7-1, counsel for the parties conferred in a telephone conference conducted on September 15, 2025, between Plaintiff's counsel and Defendant's newly-retained appellate counsel at Gibson Dunn. Counsel made a good-faith effort to resolve the issues in this motion and were unable to do so.

## MOTION

Defendant Union Pacific Railroad Company respectfully renews its motion for judgment as a matter of law on Plaintiff Mark Granas's claims because, respectfully again, Defendant believes that the claims are not supported by the evidence. Alternatively, Defendant moves for a new trial or an amendment of judgment, because the punitive damages award, in particular, is not supported by the evidence and is contrary to federal and state law. Defendant moves under Rules 50(b), 59(a), and 59(e) of the Federal Rules of Civil Procedure.

## MEMORANDUM

## INTRODUCTION

Plaintiff Mark Granas worked as a brakeman for Defendant. A brakeman is a "safety-critical" position that requires the employee to climb tall ladders and remain stationary on moving train cars. After Plaintiff dislocated his shoulder, and following a comprehensive review of the medical evidence, Defendant determined that it was no longer safe for him to work as a brakeman.

Plaintiff brought this suit, alleging, as relevant here, disability discrimination in violation of the ADA and Oregon state law, as well as an unlawful-screening policy in violation of the ADA. At trial, a jury found Defendant liable on those claims, and awarded approximately $2 million in compensatory and economic damages and $25 million in punitive damages. The punitive damages award and part of the economic damages award were merely advisory, but this Court imposed the same.

The Court should grant Defendant judgment as a matter of law on all of Plaintiff's claims. Plaintiff was not a qualified individual under either federal or state law because once he dislocated his shoulder, he could no longer perform the essential functions of his position as a brakeman.

Even if Plaintiff was a qualified individual, his claims would still fail because Defendant had statutory defenses to liability. Plaintiff posed a direct threat to himself and others in the workplace, and Defendant's qualification standards were based on business necessity.

At the very least, the Court should grant judgment as a matter of law on Plaintiff's request for punitive damages. The legal requirements for punitive damages are not satisfied here. The evidence at trial was insufficient to support a finding that Defendant acted with "malice" or "reckless indifference." 42 U.S.C. §§ 1981a(a)(2), 1981a(b)(1); *see also* O.R.S. § 31.730(1). Throughout its interactions with Plaintiff, Defendant treated Plaintiff with respect, sought to find ways to accommodate him, and ultimately placed restrictions on his return to work only because Defendant was protecting the workplace safety of its employees. Defendant understood its actions to be compliant with the ADA and with Oregon law, and that understanding—even if mistaken— was reasonable.

Even if punitive damages were not foreclosed, this Court should either reduce the punitive damages award or grant a new trial. A punitive damages award of $25 million—which amounts to a 25-to-1 ratio of punitive to compensatory damages, and nearly a 13-to-1 ratio of punitive to compensatory and economic damages—exceeds the upper limit imposed by the Due Process Clause of the U.S. Constitution. It also exceeds the $300,000 statutory cap imposed by the ADA. The Court avoided that statutory cap by allocating nearly all of the punitive damages to Plaintiff's state-law claim, but such an allocation is not appropriate here.

Defendant recognizes that the Court has already addressed some of these arguments in its prior rulings, but given the amount at stake in the case, for both parties, and the cost of an appeal, Defendant believes it will be helpful for all concerned to give them a fuller airing.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 50(b), judgment as a matter of law should be granted "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). Courts apply that same standard to affirmative defenses. *E.g.,*

*United Nat'l Maint., Inc. v. San Diego Convention Ctr. Corp., Inc*., 2012 WL 12845620, at *8 (S.D. Cal. Sept. 5, 2012), *aff'd*, 766 F.3d 1002 (9th Cir. 2014); *Jang v. Bos. Sci. Corp.*, 2015 WL 13672836, at *2 (C.D. Cal. July 6, 2015).

Under Federal Rule of Civil Procedure 59(a), a new trial should be granted when "damages are excessive." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (internal quotation marks omitted).

Under Federal Rule of Civil Procedure 59(e), a judgment should be amended to reduce the damages award if necessary "to correct manifest errors of law or fact upon which the judgment is based" or to "prevent manifest injustice." *Marsh Aviation Co. v. Hardy Aviation Ins. Inc.*, 720 F. App'x 418, 419 (9th Cir. 2018) (internal quotation marks omitted).

## ARGUMENT

## I.    Defendant Is Entitled To Judgment As A Matter Of Law.

Defendant is entitled to judgment as a matter of law on all Plaintiff's claims because no reasonable jury could find that Plaintiff was a qualified individual who could perform the essential functions of his job. In addition, Defendant permissibly imposed its workplace restrictions because Plaintiff posed a direct threat and because those restrictions were consistent with business necessity.

### A.    Plaintiff Failed To Prove That He Was A Qualified Individual.

To bring a disability discrimination claim under the ADA, "an employee bears the ultimate burden of proving that he is (1) disabled under the Act, (2) a 'qualified individual with a disability,' and (3) discriminated against 'because of' the disability." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 988 (9th Cir. 2007) (quoting *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999)). The elements of a disability discrimination claim under O.R.S. § 659A.112 are "identical." *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001). The Oregon legislature has expressly provided that Oregon's discrimination laws "shall be construed to the extent possible in a manner that is consistent with any similar provision of the federal Americans with Disabilities Act of 1990 ['ADA'], as amended." O.R.S. § 659A.139(1). Thus,

the Court may assess both claims together.  *See Snead*, 237 F.3d at 1087.

An unlawful-screening claim under the ADA requires a similar showing.  "Discrimination under the ADA includes the use of 'qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.'"  *Bates*, 511 F.3d at 989 (9th Cir. 2007) (quoting 42 U.S.C. § 12112(b)(6)).  So if a plaintiff demonstrates the employer's use of a "qualification standard," as well as a disability under the Act and his status as a "qualified individual," he has made out an unlawful-screening claim.

Defendant is entitled to judgment as a matter of law because no reasonable jury could find that Plaintiff was a qualified individual, which dooms all three of Plaintiff's claims.  A "qualified individual" is defined as "an individual" with a disability "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  "[E]ssential functions" are "fundamental job duties of the employment position," not merely "the marginal functions of the position."  29 C.F.R. § 1630.2(n)(1).  The individual must also satisfy the "prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, [and] licenses."  Appendix to Part 1630, Section 1630.2(m) Qualified Individual; *see also* 29 C.F.R. § 1630.2(m).

Plaintiff failed to prove that he meets this standard.  During Plaintiff's employment with Defendant, Plaintiff worked in the transportation department as a brakeman—a "safety-sensitive" position in which, as Plaintiff himself testified, safety was of the utmost importance.  Tr. 93, 96; *see also* Tr. 454-55.  A brakeman stands on a ladder attached to the side of a train to give signals to or communicate with an engineer backing a train into place.  Tr. 466-67.  So the "essential . . . functions" of a brakeman include climbing up and down ladders that are up to 12 feet tall, standing on the ladder steps, and riding on a moving train by holding onto "grab irons," among other difficult tasks.  Tr. 42, 95-96.

After Plaintiff fell from 15 to 20 feet and dislocated his shoulder, Tr. 241-42, Plaintiff no longer had the "skill" and "other job-related requirements," 29 C.F.R. § 1630.2(m), needed for his position as a brakeman. Plaintiff's injury was serious, and he never fully recovered. Plaintiff's own doctor described the injury as "traumatic." Tr. 388-98. Plaintiff's physical therapist similarly testified that Plaintiff had experienced "a pretty serious injury" that "demonstrate[ed] itself in his inability to do basic things." Tr. 187. She further explained that Plaintiff met less than half of his initial physical treatment goals and that, at his last visit, he "report[ed] persistent stiffness." Tr. 192-96, 201-04. She concluded that Plaintiff would benefit from continued physical therapy, but Plaintiff abruptly stopped showing up at his sessions. Tr. 201-04.

This evidence raised red flags about the risk of another on-the-job shoulder dislocation in the future—a risk Defendant worked to guard against. To protect the health and safety of its employees, Defendant had long followed certain rules regarding its expectations for brakemen and anyone else in a safety-sensitive position. The purpose of these rules—together, referred to as the "Fitness for Duty" policy—was to "ensure that employees . . . were physically and mentally fit to do their job duties safely and efficiently, and also to ensure they didn't have medical conditions that posed some underlying safety risk to them or others." Tr. 455. Among other requirements, Defendant required brakemen to have below a 1% rate of recurrence if they suffered from any medical condition that could render them suddenly incapacitated. Tr. 480, 501-02. "[S]udden incapacitation," as Defendant used the term, means "either a loss of consciousness or sudden or rapid impairment in some mental or physical function that poses a significant and immediate safety risk." Tr. 456. If a brakeman's rate of recurrence exceeded 1%, he would have to abide by certain restrictions on his employment. Tr. 480, 501-02.

Medical professionals agreed that Plaintiff's condition had more than a 1% rate of recurrence, thus triggering workplace restrictions under Defendant's policies. As Dr. Holland— chief medical officer at Defendant's Health and Medical Services Department—explained, scientific studies "show[ed] that within the first one or two years after the shoulder dislocation," the patient would have a "recurrent shoulder dislocation [at] about *30 to 60 percent*." Tr. 475

(emphasis added). Plaintiff's own doctor estimated this risk to be as high as 10%. Tr. 326-27. And an independent shoulder specialist, Dr. Streubel, agreed that the recurrence rate was "well above" the threshold of 1%. Tr. 493-94. The potential harms caused by a recurring dislocated shoulder are especially acute for a brakeman: If a brakeman "had a redislocation while [he] w[as] climbing a ladder," he could experience serious or even fatal injury. Tr. 475. Accordingly, Defendant determined that Plaintiff could not perform the essential functions of the position of brakeman.

After reaching its decision, Defendant expressed its willingness to reconsider the restrictions on Plaintiff's employment if he was able to provide further medical documentation. Tr. 445, 460-62. But Plaintiff elected not to provide that documentation or seek additional treatment to reduce his rate of recurrence. *Id.* Thus, Plaintiff remained unable to perform the essential functions of a brakeman, and no reasonable jury could find that he was a "qualified individual" under the ADA. *See Kees v. Wallenstein*, 161 F.3d 1196, 1198 (9th Cir. 1998) (plaintiff's conditions of amputated toe and displaced vertebra prevented him from performing the "essential function of the corrections officer position," which included "direct inmate contact"). Because each of Plaintiff's claims requires him to prove that he is a "qualified individual," the Court should grant judgment as a matter of law in favor of Defendant on all claims.

## B. Plaintiff's Claims Fail Because He Posed a "Direct Threat" to Himself and Others.

Even assuming Plaintiff could establish that he was qualified for the brakeman position, his ADA claims would still fail because employers are legally permitted to rely on "qualification standards" that "include a requirement that an individual shall not pose a direct threat . . . in the workplace." 42 U.S.C. § 12113(b). The same defense is available under Oregon law: An "employer may refuse to employ an individual with a disability posing a direct threat to the health or safety of others." Or. Admin. R. 839-006-0244(1).

The ADA defines "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). This statutory

exception to liability applies even when the employee poses a threat only to himself. 29 C.F.R. § 1630.2(r) (direct threat means a risk of harm "to the health or safety *of the individual* or others" (emphasis added)); *see also Chevron USA, Inc. v. Echazabal*, 536 U.S. 73, 86-87 (2002) (recognizing a "threat-to-self defense").

A determination that an individual poses a "direct threat" must be "based on an individualized assessment of the [employee]'s present ability to safely perform the essential functions of the job." 29 C.F.R. § 1630.2(r). Courts consider four factors: "(1) the duration of risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm." *Nunes*, 164 F.3d at 1248 (citing 29 C.F.R. § 1630.2(r)); *see also Hutton v. Elf Atochem North America, Inc.*, 273 F.3d 884, 894 (9th Cir. 2001) (employers must consider both "the likelihood of an accident" and "the severity and scale of the potential harm").

Here, Defendant imposed the workplace restrictions after a comprehensive review of Plaintiff's medical records and consultation with several medical professionals, including an independent shoulder expert. *See supra* 5-6. Based on this assessment, Defendant reasonably concluded that Plaintiff posed a "direct threat" to himself or others. All four factors support Defendant's decision. *First*, the risk is indefinite because the evidence showed that, even if Plaintiff underwent surgery on his shoulder, the risk of a recurring dislocation could not be ruled out. *See* Tr. 478, 481-82, 554-55. *Second*, the potential harm—falling from a moving or stationary train ladder—could cause severe injury or even death. Tr. 475, 489. *Third*, the risk of recurrence ranged from 0-10% (according to Plaintiff's treating doctor) up to 60% (according to the high end of Defendant's chief medical officer's analysis). Tr. 326-27, 475. *Fourth*, the "imminence of the potential harm is . . . unknown because of the unpredictability of [plaintiff's] condition," which further heightens the risk associated with allowing him to work as a brakeman. *Hutton*, 273 F.3d at 894-95. Defendant's workplace restrictions were therefore reasonable.

This conclusion is further supported by the Court's recent decision in *Milan v. Union Pacific Railroad Co.*, 2019 WL 2030553, at *1 (D. Or. Apr. 19, 2019), *recommendation and report*

*adopted*, 2019 WL 2030723 (D. Or. May 8, 2019).  That case involved a Union Pacific employee who lost consciousness while driving a train.  His treating neurologist concluded that he had "far less than a 5% chance of having epilepsy," and that "it was safe for him to drive and return to work." *Id.* at *2.  But Union Pacific independently reviewed the employee's medical records and determined that the employee's condition nevertheless posed safety risks.  *Id.* at *3.  The court granted summary judgment in favor of Union Pacific on the plaintiff's disability discrimination claim, concluding that Union Pacific's "direct threat" determination was objectively reasonable. *Id.* at *9.  The court explained that Union Pacific had relied on the recommendations of its physicians, and that the risk of sudden incapacitation in a safety-critical position poses "significant and imminent risk for substantial harm to the worker, co-workers, the public, property, and the environment." *Id.*

Several other courts have reached the same conclusion.  Just a few months ago, for example, one court explained that no "rational juror could conclude" that Union Pacific's "direct threat" determination, which likewise relied on fitness-for-duty evaluations and Dr. Holland's medical opinion, was "objectively unreasonable."  *Seals v. Union Pac. R.R. Co.*, 2025 WL 2061528, at *8, *10 (D. Neb. July 23, 2025).  Even though Dr. Holland's opinion "may have differed" from the opinion of plaintiff's treating doctors, "the direct threat defense does not require complete agreement among all doctors." *Id.* at *8; *see also Christensen v. Union Pac. R.R. Co.*, 2025 WL 1682676, at *8 (D. Neb. May 23, 2025) ("Reasonable doctors of course can disagree . . . the law requires only that the employer rely on an 'objectively reasonable' opinion, rather than an opinion that is correct."); *Krehbiel v. Union Pac. R.R. Co.*, 2020 WL 5503363, at *10 (D. Kan. Sept. 11, 2020) (upholding Union Pacific's "direct threat" determination for an employee struggling with substance abuse as "objective[ly] reasonabl[e]").

This case is no different.  Although Plaintiff's doctors cleared Plaintiff to return to work, Defendant relied on the recommendations of its physicians to impose workplace restrictions.  Opinion 12, 22-25 ("Op.") (ECF 122).  And Defendant did so because the risk of Plaintiff dislocating his shoulder again while he climbs 12-foot ladders to help engineers back up trains

threatens his own safety and the safety of other Defendant employees.

Because Plaintiff posed a "direct threat" to himself and others, 42 U.S.C. § 12113(b), Defendant is entitled to judgment as a matter of law on all of Plaintiff's claims.

### C.    Plaintiff's Unlawful-Screening Claim Fails Because The Screening Criteria Were Necessary And Related To His Job.

Plaintiff's unlawful-screening claim under the ADA also fails as a matter of law because Defendant's Fitness for Duty policy was consistent with business necessity.

Allegedly discriminatory "qualification standards . . . that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability" are permitted where the standards are "job-related and consistent with business necessity."  42 U.S.C. § 12113(a); *see Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 568 (1999).  A qualification standard is "job-related" when it is "related to the specific skills and physical requirements of the sought-after position." *Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir. 2001) (internal quotation marks omitted).  The standard also must be "consistent with business necessity," *Bates*, 511 F.3d at 995, which "includes" the employer's concerns about "public and workplace safety." *Parker v. Crete Carrier Corp.*, 158 F. Supp. 3d 813, 822 (D. Neb. 2016), *aff'd*, 839 F.3d 717 (8th Cir. 2016).  And performance of the job must be unable to "be accomplished by reasonable accommodation," which means either that no reasonable accommodation would cure the performance deficiency or that any reasonable accommodation would pose an undue hardship on the employer. *Bates*, 511 F.3d at 996-97.

Here, Defendant's Fitness for Duty policy is job-related.  That policy and the individualized analysis it involved accurately measured Plaintiff's actual ability to work in the position of brakeman.  Defendant applied the policy to all safety-sensitive positions where "mistakes could result in an accident." Tr. 455-56.  For each position, Defendant developed specific rules regarding the employee's "duty to be medically and physically able to safely and efficiently carry out the job duties." Tr. 459-61.  It was an employee's responsibility to "inform their manager and the Health and Medical Services" if they suffered an injury or a medical condition that could "affect their

safety" at work.  Tr. 461.  That report would trigger an individualized review process, which was guided by the relevant medical evidence and the opinions of experts, to determine whether the employee could sufficiently carry out the duties of his or her position.  *See supra* 5-6.  Defendant's policy, in short, "related to the specific skills and physical requirements of the sought-after position" of brakeman.  *Cripe*, 261 F.3d at 890.

The Fitness for Duty policy also promotes Defendant's business needs.  "[S]afety was the primary justifying business purpose" for the policy, and "such safety was an essential aspect of [Defendant's] business."  *Harriss v. Pan Am. World Airways, Inc.*, 649 F.2d 670, 675 (9th Cir. 1980); *see also Parker*, 158 F. Supp. 3d at 822.  Defendant should not be faulted for exercising the utmost caution with respect to the safety of its trains and train operators.  And as this Court already found, Defendant "engaged in the interactive dispute process" to attempt to accommodate Plaintiff in good faith, but its efforts were unsuccessful.  ECF No. 37 at 21.

Defendant therefore established all elements of the business necessity defense.  In turn, Plaintiff's unlawful-screening claim fails as a matter of law.

## II.     The Court Should Grant Defendant Judgment As A Matter Of Law On Punitive Damages, Or At Least Reduce The Award.

Defendant's conduct does not satisfy the statutory requirements for punitive damages under either the ADA or Oregon law.  Even if it did, the punitive damages award of $25 million grossly exceeds the constitutional limit under the Due Process Clause of the U.S. Constitution, including as it has been interpreted and applied by the Oregon Supreme Court.

### A.     The Evidence Is Insufficient To Support Punitive Damages Under Federal Or State Law.

Punitive damages are foreclosed as a matter of law under both federal law and Oregon law. The award of punitive damages should be vacated in its entirety.

#### 1.     Federal Law.

Punitive damages are available on ADA claims only if a plaintiff proves that the defendant acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(a)(2), (b)(1).  This language reflects "congressional intent to

authorize punitive awards in only a subset of cases involving intentional discrimination." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999). The terms "malice" and "reckless indifference" "focus on the actor's state of mind," and can be satisfied through evidence of "egregious misconduct" on the part of the employer. *Id.* at 535.

Plaintiff did not present evidence that anyone involved in his return-to-work decision acted with any ill will or malice toward him. The employees involved in the decision—Ms. Ziemer, a fitness-for-duty nurse; Dr. Holland, the chief medical officer; and Dr. Charbonneau, the associate medical officer—did not know Plaintiff personally. Zeimer, who had the most interactions with Plaintiff of the group, testified that she felt "sadden[ed]" whenever an employee could not return to work, because "[t]hat is their career, it is their livelihood." Tr. 433. She understood "the gravity of" the situation, and explained that "it's never a good feeling" to decide that an employee could no longer work with Defendant. *Id.* However, Zeimer took comfort in knowing that "I have done anything I could possibly do to help Mr. Granas through the process." *Id.* Similarly, Charbonneau testified that his one phone call with Plaintiff was "positive" and "cordial" and "proceeded . . . smoothly, considering the serious nature of" the issue. Tr. 592, 604, 606. Throughout the process, all of Defendant's employees were guided solely by their desire to protect the physical safety of Plaintiff and his coworkers.

Defendant also solicited the opinions of other medical professionals before making a final decision regarding Plaintiff's return to work. As explained above, Defendant considered the opinion of Plaintiff's physician, Dr. Heaton, Tr. 586-87, and the opinion of an independent shoulder specialist, Dr. Streubel, Tr. 481-82. Defendant allowed Plaintiff to submit any medical information he wanted, Tr. 445, 460-62, and to seek reconsideration of the initial decision, Tr. 419-20, 424. After the final decision, Defendant also tried to contact Plaintiff about other job options and to invite him to submit new medical information that could be considered. Tr. 445. On this evidence, "[n]o reasonable jury could find that Union Pacific's individualized assessment of [plaintiff] was based on anything other than objectively reasonable medical judgment"—not malice. *Bingham v. Union Pac. R.R. Co.*, 693 F. Supp. 3d 1033, 1061 (D. Neb. 2023); *see also*

*Michael v. City of Troy Police Dep't*, 808 F.3d 304, 307 (6th Cir. 2015) ("An employer's determination that a person cannot safely perform his job functions is objectively reasonable when the employer relies upon a medical opinion that is itself objectively reasonable.").

The fact that Defendant's process and decision were guided by a generally applicable policy further undermines, not supports, a finding of malice or reckless indifference. *Contra* Op. 38. Plaintiff agrees that Defendant had a general policy prohibiting any employee with greater than a 1% risk of sudden incapacitation from climbing vertical ladders. *See* ECF 33, at 2-3. All individuals in a "safety-sensitive" position were held to this standard. Tr. 454-60. This is precisely the type of evidence that other courts have found insufficient to support a claim for punitive damages. For instance, in *Sing v. Hawaiian Airlines, Inc.*, 2021 WL 5310896 (D. Haw. Nov. 15, 2021), the court granted summary judgment in favor of the employer on a request for punitive damages because "terminating Plaintiff through a negotiated, pre-established attendance policy— even when Defendant may have erroneously applied that policy—tends to undercut Plaintiff's assertion of malice or reckless intent as to a violation of law." *Id.* at *1, *13. The same is true here.

Nor are punitive damages appropriate on the ground that Defendant was generally "aware of anti-discrimination principles." Op. 39. "A party's mere awareness of the existence of anti-discrimination laws, without more, is not enough" for an award of punitive damages. *Aly v. Mohegan Council, Boy Scouts of Am.*, 871 F. Supp. 2d 19, 27 (D. Mass. 2012). Rather, the employer must have "discriminate[d] in the face of a *perceived risk that its actions will violate federal law*." *Kolstad*, 527 U.S. at 536 (emphasis added). When an employer was "aware of the specific discriminatory conduct at issue, but nonetheless reasonably believe[d] that conduct is lawful," it "may not be liable for punitive damages." *Helm v. Country Couch, Inc.*, 2007 WL 1695155, at *3 (D. Or. June 7, 2007) (internal quotation marks omitted); *see also Hounshel v. Battelle Energy Alliance, LLC*, 2014 WL 3408559, at *3 (D. Idaho July 10, 2014) ("no reasonable jury" could find that employer acted with "malicious intent or with reckless disregard" when employer was trying to "ensur[e] a safe and civil workplace").

Here, there is insufficient evidence to conclude that Defendant was "aware . . . that its policy was facially discriminatory" in violation of the ADA. Op. 39. In fact, Defendant had *prevailed* on prior ADA challenges to its 1% policy. *See, e.g.*, *Carlton v. Union Pac. R.R. Co.*, 2023 WL 6388021, at *14 (D. Neb. Sept. 29, 2023) ("[T]he Court holds that the '1% rule' does not constitute direct evidence of disability discrimination."). And courts have also repeatedly upheld the individualized determinations of Defendant's medical professionals as "objectively reasonable," even when an employee's treating doctor came to a different conclusion. *See, e.g.*, *Milan*, 2019 WL 2030553, at *1; *Seals*, 2025 WL 2061528, at *8, *10; *Christensen*, 2025 WL 1682676, at *8. Defendant thus had good reason to think that its policy was lawful. There is no malice or reckless disregard of federally protected rights where an "employer discriminates with the distinct belief that its discrimination is lawful." *Kolstad*, 527 U.S. at 537.

Moreover, when an employer "actively consider[s] whether [it] could accommodate Plaintiff's disability," it is not "reasonable" to infer that the employer "w[as] acting with knowledge that [it] may be violating federal law." *Kirbyson v. Tesoro Refining & Marketing Co.*, 795 F. Supp. 2d 930, 947 (N.D. Cal. 2011). As this Court found, Defendant did not apply the policy as a rigid blanket rule but rather "engaged in the interactive dispute process" and attempted in good faith to accommodate Plaintiff despite his injury. ECF No. 37 at 22.

Punitive damages are therefore not available as a matter of law under the ADA.

### 2.    State Law.

Punitive damages are also not available under state law. Oregon law permits punitive damages for disability discrimination claims only where "it is proven by clear and convincing evidence that the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others." O.R.S. § 31.730(1). The Oregon Supreme Court has interpreted "[m]alice" to mean "a wrongful act done intentionally without just cause or excuse." *Friendship Auto Sales, Inc. v. Bank of Willamette Valley*, 716 P.2d 715, 722 (Or. 1986). And it has cautioned that punitive damages require "proof of an intentional,

unjustifiable infliction of harm with deliberate disregard of the social consequences." *Id.*

Oregon law's requirement of "malice" or "reckless and outrageous indifference" is at least as rigorous as the ADA's standard for punitive damages. *Austin v. Wal-Mart Stores, Inc.*, 2008 WL 4936480, at *14 (D. Or. Nov. 14, 2008) (describing the requirements of punitive damages under O.R.S. § 31.730(1) as "nearly identical" to federal law). If anything, Oregon law is even more exacting, as demonstrated by the fact that Oregon law requires "reckless *and outrageous* indifference," O.R.S. § 31.730(1) (emphasis added), as opposed to just "reckless indifference," 42 U.S.C. § 1981a(b)(1). Thus, for all the reasons explained above, punitive damages are not available as a matter of law here. *See supra* 11-13.

This conclusion is confirmed by the fact that prior cases approving punitive damages under O.R.S. § 31.730 involve far more egregious conduct by the defendant, such as a tobacco manufacturer that knew its cigarettes could cause "serious harm" and "fraudulently represented" otherwise. *Schwarz v. Philip Morris USA, Inc*., 355 P.3d 931, 939 (Or. Ct. App. 2015) (awarding punitive damages where plaintiff's wife died from lung cancer). One particularly instructive decision is *Hamlin v. Hampton Lumber Mills, Inc*., 193 P.3d 46 (Or. Ct. App. 2008), *rev'd on other grounds*, 246 P.3d 1121 (2011). There, the plaintiff sued his former employer for its refusal to reinstate the plaintiff as an employee after he had recovered from a work-related injury. 193 P.3d at 48. The jury awarded $175,000 in punitive damages under the same statute at issue here, O.R.S. § 31.730, and the court concluded that "a rational juror could find" that plaintiff was entitled to punitive damages because the defendant: "had failed to properly train and supervise him"; repeatedly and deceptively told plaintiff "his job was safe"; did not conduct any "internal investigation" regarding whether plaintiff was a safety risk; and "hast[ily]" deemed plaintiff a safety risk "only after it discovered that plaintiff had a statutory right to reinstatement," 193 P.3d at 51. Defendant's alleged conduct in this case is a far cry from that level of indifference towards the employee's rights. Defendant never misled Plaintiff about his job's status, it conducted a careful analysis of Plaintiff's safety risk based on multiple medical opinions, and it followed established, generally applicable policies to assess whether Plaintiff could safely resume his job.

*Supra* 9-10.  And yet here, the Court awarded nearly *150 times* the amount of punitive damages at issue in *Hamlin*.  There is no justification for that outcome.

**B.    The Punitive Damages Award Is Excessive Under The Due Process Clause.**

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit "imposing a 'grossly excessive' punishment on a tortfeasor."  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996) (internal quotation marks omitted).  This is because "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive[s] fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."  *Id.* at 574.  To determine whether a punitive damages award is "grossly excessive," the Supreme Court has articulated "three guideposts":  "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).

Applying all three guideposts to this case demonstrates why the Court should—at a minimum—reduce the punitive damages award to no more than a 1-to-1 ratio to compensatory damages ($1 million) or, in the alternative and at most, a 1-to-1 ratio to compensatory and economic damages ($1,952,863).

*1. No (or low) reprehensibility.*  The reprehensibility of a defendant's conduct is assessed by considering whether:  "[(1)] the harm caused was physical as opposed to economic; [(2)] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [(3)] the target of the conduct had financial vulnerability; [(4)] the conduct involved repeated actions or was an isolated incident; and [(5)] the harm was the result of intentional malice, trickery, or deceit, or mere accident."  *State Farm*, 538 U.S. at 419.

Here, every single consideration cuts against a finding of reprehensibility.  First, the harm to Plaintiff was economic—the loss of his job—and not physical.  Harm that is "purely economic" is less reprehensible.  *Gore*, 517 U.S. at 576; *see Bains v. Arco Prods. Co., Div. of Atl. Richfield*

*Co.*, 405 F.3d 764, 775 (9th Cir. 2005) (vacating $5 million punitive damages award in race discrimination case involving $50,000 in compensatory damages because the harm was "economic" and involved "no threat of physical harm," thereby "reduc[ing] reprehensibility").

Second, Defendant's conduct does not "evinc[e] an indifference or reckless disregard [for] the health and safety of others." *State Farm*, 538 U.S. at 419. On the contrary, Defendant made its decision to *protect* the safety of Plaintiff and his co-workers.

Third, punitive damages are not justified by Plaintiff's "financial vulnerability." *State Farm*, 538 U.S. at 419. This factor considers more than just the relative wealth of the plaintiff and the defendant: "[T]o serve as justification for a punitive damage award, a defendant's wealth must bear some relation to the harm sustained by the plaintiff," like when the defendant unjustly takes advantage of the plaintiff's circumstances. *Clark v. Chrysler Corp.*, 436 F.3d 594, 604 (6th Cir. 2006) (citing *State Farm*, 538 U.S. at 427). Those circumstances are not present here. There is no "connection between" Defendant's "financial resources" and Plaintiff's alleged harms. *Id.* Moreover, financial vulnerability requires "severe" financial difficulty "to an extent that fundamentally undermines or challenges an individual's quality of life," and not just financial hardship in general. *Minden v. Allstate Property & Casualty Ins. Co.*, 2025 WL 2528624, at *9 (D. Nev. Sept. 3, 2025); *see, e.g.*, *Leavey v. Unum Provident Corp.*, 295 F. App'x 255, 258 (9th Cir. 2008) (plaintiff was "vulnerable" because he "suffered from anxiety and depression, was recovering from a serious drug addiction, and was at a high risk of relapse" after disability insurance company denied his claim for benefits).

Fourth, Defendant did not "repeatedly engage[] in prohibited conduct while knowing or suspecting that it was unlawful." *Gore*, 517 U.S. at 576. As described above, courts have held that Defendant's "'1% rule' does *not* constitute direct evidence of disability discrimination," *Carlton*, 2023 WL 6388021, at *14 (emphasis added), and they have held that it was lawful for Defendant to follow its own doctor's recommendation over an employee's treating doctor's recommendation, *Milan*, 2019 WL 2030553, at *1; *see also Seals*, 2025 WL 2061528, at *8, *10; *Christensen*, 2025 WL 1682676, at *8.

Fifth, Plaintiff never alleged that Defendant engaged in malice, trickery, or deceit.

Accordingly, zero factors are present here. And even if any of these considerations *were* satisfied, the mere existence of "one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award." *State Farm*, 538 U.S. at 419. Defendant's conduct reflects no or low reprehensibility, much less than the egregious reprehensibility required by the Constitution to justify a $25 million punishment on these facts.

　　　2.　　***Substantial Disparity.***　To determine the "disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award," *State Farm*, 538 U.S. at 418," courts consider the ratio of punitive damages to compensatory damages. Under the ADA, "compensatory damages" excludes backpay and front pay. 42 U.S.C. § 1981a; Op. 36. So courts have determined the excessiveness of punitive damages awards by comparing the "ratio of punitive damages to compensatory damages (not including the separate awards of back pay and front pay)." *Morse v. S. Union Co.*, 174 F.3d 917, 925 (8th Cir. 1999) (considering damages for age-discrimination claims); *accord Laymon v. Lobby House, Inc.*, 613 F. Supp. 2d 504, 514-15 (D. Del. 2009); *Quinby v. WestLB AG*, 2008 WL 3826695, at *1, *5 (S.D.N.Y. Aug. 15, 2008); *Tomao v. Abbott Lab'ys, Inc.*, 2007 WL 2225905, at *22-23 & n.6 (N.D. Ill. July 31, 2007). Here, there is a substantial disparity between the $25 million punitive damages award and the $1 million in "compensatory damages." Op. 45. That substantial disparity persists even if the punitive damages award is measured against the $1,952,863 total award of compensatory and economic damages.

The Supreme Court has emphasized that "few awards exceeding a single-digit ratio" will "satisfy due process." *State Farm*, 538 U.S. at 425. In fact, the Court's precedents indicate that anything exceeding a 4-to-1 ratio is "close to the line of constitutional impropriety." *Id.*; *see, e.g.*, *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23 (1991) (punitive damages award "more than 4 times the amount of compensatory damages" "may be close to the line"). And when "compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425.

Here, the punitive-to-compensatory ratio is *25-to-1*—a double-digit ratio that raises immediate red flags. *State Farm*, 538 U.S. at 425. Even the punitive-to-compensatory-and-economic-damages ratio is *12.8-to-1*, which still rings alarm bells.

This is not one of the "few" cases where an award exceeding a single-digit ratio is justifiable because a defendant committed a "particularly egregious act [that] has resulted in only a small amount of economic damages." *State Farm*, 538 U.S. at 425. To the contrary, Defendant acted in good faith and with the understanding that its actions were lawful. *Supra* 13. And the compensatory damages ($1 million) and economic damages ($952,863) were, individually and collectively, "substantial." *State Farm*, 538 U.S. at 425; *see Bains*, 405 F.3d at 776 (in a discrimination case, $50,000 qualified as "substantial" "economic damages"). So a 1:1 ratio (if that) is the most the Constitution could permit here. *See State Farm*, 538 U.S. at 425.

That would still be the case even if the Court were to hold that some guideposts favor a larger award. In *Dawe v. Corrections USA*, 506 F. App'x 657 (9th Cir. 2013), for example, compensatory damages totaled about $2.5 million. *Id.* at 660. The Ninth Circuit held that a 1:1 ratio was proper where plaintiffs "did not suffer physical harm" and defendant's conduct "did not evince a reckless disregard of bodily health"—even though some "factors, namely malice and financial vulnerability, tilt toward" plaintiffs. *Id.*

As explained in Defendant's prior briefs, the Oregon Supreme Court follows the same substantial-disparity guideposts for review of awards of punitive damages. *See* ECF 119, at 13-15.

**3.    *Comparable Penalties.*** The final guidepost set forth by the Supreme Court is the amount of "civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418. In *Gore*, for example, the Court held that a $2 million punitive damages award was excessive where the statutory fine was, at most, $10,000. 517 U.S. at 584. Similar concerns are present here. By enacting a statutory cap on punitive damages in ADA cases, "Congress has made a reasoned judgment" about the level of punitive damages that should be awarded "in cases like the one at hand." *Arizona v. ASARCO LLC*, 773 F.3d 1050, 1058 (9th Cir. 2014). The Oregon Supreme

Court has likewise considered the federal cap on damages to be a relevant yardstick for punitive-damages awards. *See Hamlin v. Hampton Lumber Mills, Inc.*, 246 P.3d 1121, 1130-31 (Or. 2011) (concluding that $175,000 in punitive damages was not excessive because it was not greater than the $200,000 cap on compensatory and punitive damages, for employers of that defendant's size, under federal discrimination law). Congress determined that $300,000 was an appropriate limit for *both* compensatory and punitive damages, and the Court's award of $25 million in *only* punitive damages far exceeds that limit. As another indication of excessiveness, violations of other ADA requirements—specifically, its public accommodations requirements—are subject to civil fines up to $75,000 for the first violation and $110,000 for the second violation. *See* 28 C.F.R. § 36.504(a)(3). Those penalties are mere pocket change compared to the $25 million award in punitive damages.

In approving the punitive damages award, the Court noted that "[i]n 2024, Defendant had revenue of $24.3 billion and net income of $6.7 billion," which amounted to "$18.5 million dollars a day in profit." Op. 33. But "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." *State Farm*, 538 U.S. at 427. A "large corporation" is no less "entitle[d] to fair notice" of the penalties for its conduct. *Gore*, 517 U.S. at 585. Even Plaintiff concedes that "a defendant's ability to pay a large punitive damages award is not conclusive of the award's validity." ECF 120, at 10.

For these reasons, due process limitations dictate that Defendant's punitive damages award be reduced to no more than $1 million or, in the alternative and at most, $1,952,863.

## III.    The Damage Award Should Not Be Allocated Almost Entirely To The State Law Claim.

The ADA imposes a $300,000 statutory cap on compensatory and punitive damages against employers with over 500 employees, such as Defendant. 42 U.S.C. § 1981a(b)(3)(D). The Court acknowledged this cap, Op. 35-36, yet avoided it by allocating all of the compensatory damages and $24.7 million of the $25 million in punitive damages to Plaintiff's state law discrimination

claim, *id.* at 45.[1]

The Court cited the Ninth Circuit's decision in *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493 (9th Cir. 2000), as the source of its authority to allocate damages in this way. Op. 45. But *Passantino* does not control here. That case involved two twin claims—one federal and one state—that were "evaluated under the same legal standard." *Passantino*, 212 F.3d at 509; *see id.* at 515. Because the standards for liability under state and federal law were the same, the court explained, "the damage awards were fungible" and could be allocated to either the federal or state claim. *Id.* at 515.

Here, however, there are two distinct theories of liability: a discrimination claim under federal and state law, and a federal unlawful-screening claim. The discrimination claims evaluated whether Defendant "refused to allow" Plaintiff to return to his job "because of his disability," while the unlawful-screening claim evaluated whether Defendant imposed "selection criteria" that allegedly screened out Plaintiff. ECF 103 at 1-2. There are also distinct standards for punitive damages under state and federal law. *See supra* 13-14. Plaintiff's claims therefore are not "interchangeable" or "fungible." *Passantino*, 212 F.3d at 509, 515.

Given those differences, this case is instead analogous to *BladeRoom Group Ltd. v. Emerson Elec. Co.*, 20 F.4th 1231 (9th Cir. 2021), where the Ninth Circuit reversed the district court's allocation of a damages awards between a breach-of-contract claim and a misappropriation claim. Even though the evidence showed that "either claim for which the jury found liability could support the amount of compensatory damages it awarded," the district court had allocated the entire amount of compensatory damages to the misappropriation claim. *Id.* at 1248 (alterations omitted). The Ninth Circuit held that "the allocation was inadequate" because, although it "'may well represent a permissible allocation of the damages between the two theories, the district court gave no explanation for its decision, leaving us guessing whether this exercise of discretion is a

---

[1] To the extent some or all of the compensatory damages are later allocated to the federal-law claims, Defendant preserves the right to argue that those damages are not supported by sufficient evidence and are otherwise improper.

permissible one.'" *Id.* (quoting *Gibson v. Moskowitz*, 523 F.3d 657, 667 (6th Cir. 2008)). Likewise, here it is not apparent whether the jury awarded compensatory and (advisory) punitive damages based on Plaintiff's unlawful-screening theory or his discrimination theory, or whether it awarded (advisory) punitive damages under state law or federal law, and there is "no way" to discern its reasoning from the record. *Id.* at 1247. Given the important differences in theories of liability and standards for punitive damages, the allocation here "does not intuitively follow from the evidence." *Gibson*, 523 F.3d at 667 (reversing allocation of damages where one claim required plaintiff to "prove more in the way of culpability"). As in *Gibson*, it seems inappropriate to allocate damages that "went to the top of the [statutory] 'high cap'" under one claim and then "allocate[ ] the rest" to an uncapped claim. *Id.*

This Court therefore should amend its judgment to allocate the punitive damages award to the federal claims, subject to the ADA's $300,000 cap. *See* 42 U.S.C. § 1981a(b). Alternatively, this Court should hold a new trial in which it asks "the jury to allocate damages between" the different theories of liability using "a more-detailed special verdict form." *BladeRoom*, 20 F.4th at 1248.

## CONCLUSION

Defendant respectfully submits that the Court should enter judgment as a matter of law under Federal Rule of Civil Procedure 50(b). In the alternative, this Court should order a new trial or amend the judgment to reduce the punitive damages award under Federal Rule of Civil Procedure 59.

Dated: September 15, 2025    Respectfully submitted,

*/s/* Thomas M. Christ
Thomas M. Christ
Sussman Shank LLP

*Counsel for Defendant Union Pacific Railroad Company*

## CERTIFICATE OF SERVICE

I hereby certify that on the date below, I electronically filed the foregoing documents with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Anthony S. Petru, *Pro Hac Vice*
Gavin S. Barney (OR # 163382)
Autumn D. Shreve (OR #130226)
Hildebrand McLeod & Nelson, LLP
250 Frank H. Ogawa Plaza, 4th Floor
Oakland, CA 94612
P:  (510) 451-6732
petru@hmnlaw.com
barney@hmnlaw.com
shreve@hmnlaw.com

*Attorneys for Plaintiff*

James H. Kaster, *Pro Hac Vice*
Lucas Laster*, Pro Hac Vice*
Nichols Kaster, PLLP
4700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
P:  (612) 256-3200
kaster@nka.com
lkrause@nka.com

*Attorneys for Plaintiff*

DATED:  September 15, 2025

*/s/ Thomas M. Christ*
Thomas M. Christ
Sussman Shank LLP